J. & R. Electric Co., a Corporation, Plaintiff-Appellee, v. Edward P. Allison Co., Inc., a Corporation, Defendant-Appellant.

Gen. No. 69–42.

Fifth District.

June 22, 1970.

Rehearing denied August 12, 1970.

MORAN, P. J., dissenting.

William M. Wolff, of Murphysboro, and Seymour I. Burton and Jerome F. Dixon, of Chicago, for appellant.

John C. Feirich, of Carbondale, for appellee.

GOLDENHERSH, J.

Defendant, Edward P. Allison Co., Inc., appeals from the judgment of the Circuit Court of Jackson County entered in favor of plaintiff, J. & R. Electric Co. in the amount of $32,381 after a nonjury trial.

In this action plaintiff seeks to recover from defendant one-half of the loss allegedly sustained in the completion of the jobs enumerated in paragraph 10 of the contract hereafter discussed and construed.

The record shows that on December 30, 1964, plaintiff, defendant and J. & R.-Allison, Inc., hereafter called J. & R.-Allison, entered into a written agreement, the preamble of which states that plaintiff and defendant own respectively 49% and 51% of the outstanding shares of stock of J. & R.-Allison which by mutual agreement has been, for several months, in the process of dissolution, and the parties prefer that rather than dissolve J. & R.-Allison, plaintiff buy defendant's shares.

The agreement provides for the purchase by plaintiff of defendant's shares for the sum of $510, and the resignation of certain directors and corporate officers who are defendant's "representatives" in the management of J. & R.-Allison. It further provides that defendant will release plaintiff and J. & R.-Allison of all claims which it may have against either except those provided in the agreement, that defendant will not in any manner deal with the assets or liabilities of either plaintiff or J. &

R.-Allison and will not do any act which will create any liability on the part of either plaintiff or J. & R.-Allison.

It further provides that defendant will make an assignment of all of its right, title and interest in and to the assets of J. & R.-Allison except its rights under this agreement and it also agreed to deliver to plaintiff all the books, seals, records, etc. of J. & R.-Allison. Defendant also agreed to execute all documents necessary in the opinion of plaintiff, J. & R.-Allison or its counsel "to satisfactorily complete the transfer herein provided for and carry out the manifest intent of this agreement, namely: for J. & R. (plaintiff) to completely purchase all the right, title and interest of Allison (defendant) in The Corporation (J. & R.-Allison)."

Paragraph 8 of the agreement provides:

> "8. J. & R. (plaintiff) agrees that it will not in any manner whatsoever deal with the assets or liabilities of ALLISON, (defendant) and will do nothing which might give rise to any suit, claim, claim for lien, lien, or the like whatsoever, and will not in any manner whatsoever make any contract, undertake any obligation, borrow any money, pledge any asset of any nature whatsoever, or in any way encumber any asset in any manner whatsoever of THE CORPORATION (J. & R.-Allison) or of ALLISON which might in any manner whatsoever make ALLISON liable or responsible in whole or in part therefor."

In paragraph 9 plaintiff agreed to execute such documents as in the opinion of defendant or its counsel are necessary "to satisfactorily complete the transfer herein provided for and carry out the manifest intent of this Agreement, namely: for J. & R. to completely purchase all the right, title and interest of ALLISON in the CORPORATION."

The remaining paragraphs of the agreement provide:

"10. It is mutually agreed and understood that there are eight jobs yet to be completed by THE CORPORATION, which are now in progress, which are designated as follows: JR 183, JR 161, JR 164, JR 108, JR 110, JR 111, JR 112, and JR 114. It is also understood that there are numerous accounts receivable and accounts payable of said CORPORATION, together with substantial sums owed by THE CORPORATION to both ALLISON and J. & R., which are hereinafter referred to as INVESTMENT ACCOUNTS. It is mutually agreed that THE CORPORATION will continue in business hereafter for the principal purpose of completing the jobs above noted, collecting the accounts receivable, paying the accounts payable, paying the INVESTMENT ACCOUNTS, and then distributing the net profit or loss of THE CORPORATION. The balance of this Agreement has to do with such continued operation.

"11. It is mutually agreed that the jobs in progress shall be completed as rapidly as possible and that the accounts receivable shall be collected as rapidly as possible.

"12. J. & R. Agrees to furnish the necessary manpower to operate THE CORPORATION to completion for which it shall be paid twenty per cent (20%) of the productive labor necessary and performed in that regard as an overhead charge to the CORPORATION. In this regard, it is mutually agreed that J. & R. has full power and authority as the sole stockholder of THE CORPORATION to do and perform any and all acts necessary to the continued operation of THE CORPORATION, but that in so doing, it shall protect ALLISON from any liability or responsibility in accordance with the terms of Paragraph 8 hereof.

"13. It is mutually agreed that the INVEST-MENT ACCOUNTS of J. & R. and ALLISON in THE CORPORATION are as follows:

"ALLISON                    $35,694.77
"J. & R.                       $26,758.39.

"THE CORPORATION shall immediately upon the execution of this Agreement borrow the sum of $24,490.00, at six per cent (6%) interest, and that amount shall be paid by THE CORPORATION to ALLISON in reduction (68.61%) of ALLISON'S INVESTMENT ACCOUNT. Thereafter, as accounts are collected and work is completed and paid for, the income of THE CORPORATION shall be paid in the following priorities:

"(a) The operating expenses of THE CORPORA-TION, including the overhead charge to J. & R., as herein provided for.

"(b) All accounts and notes payable, including THE CORPORATION'S note for $24,490.00, as aforesaid, and all interest and charges thereon.

"(c) To J. & R. in reduction of its INVESTMENT ACCOUNT until 68.61% thereof, or $18,358.93, has been paid.

"(d) Thereafter, on a fifty-fifty basis to ALLISON and J. & R. until both INVESTMENT AC-COUNTS have been paid in full.

"(e) Thereafter, on a fifty-fifty basis to J. & R. and ALLISON, as a distribution of profit from the CORPORATION.

"It is agreed that losses, if any, shall be dis-tributed in the same priority and order as income and profits are to be distributed as above stated.

"14. It is agreed that THE CORPORATION will render a monthly accounting to ALLISON concern-

ing its operations to the end that ALLISON is fully informed concerning the performance of the terms of this Agreement and that this will be ALLISON'S only interest in the operation of THE CORPORATION."

The agreement is executed by all three corporations.

Plaintiff offered the testimony of Audrey M. Davis, plaintiff's bookkeeper, who also served as bookkeeper for J. & R.-Allison, and Bernard Ross, a certified public accountant. It offered, and the court admitted in evidence, J. & R.-Allison's financial statements for a ten-month period ending December 31, 1964, and a three-year period ending February 28, 1967. These statements were prepared by Mr. Ross' firm. Also admitted in evidence as defendant's exhibit is a statement prepared by Mrs. Davis showing the breakdown of receipts and costs on the jobs enumerated in paragraph 10 of the agreement. This exhibit is the only evidence adduced by defendant.

Defendant took no part in the operation of J. & R.-Allison after December 30, 1964. Plaintiff provided such funds as were necessary to complete the jobs. No statements were sent defendant as provided in paragraph 14 of the agreement. Mrs. Davis testified that at no time did defendant make any inquiry as to the operations.

The court entered judgment in favor of plaintiff in the amount which Mr. Ross testified was due under his interpretation of the agreement, and this appeal followed.

It is defendant's contention that under the terms of the agreement plaintiff agreed to hold defendant harmless from any liabilities arising from the operation of J. & R.-Allison, and the court erred in construing the contract to hold defendant liable.

■ Prior to discussing the issues presented for review, it is deemed appropriate to comment upon one contention made by plaintiff. Plaintiff argues that the basis

for defendant's attack on the judgment was not made an issue in the trial court and cannot be considered by this court. It is true that ordinarily an appellate court should not consider different theories if proof might have been offered to refute them had they been presented in the trial court, Hux v. Raben, 38 Ill2d 223, 225, 230 NE2d 831. However, here the grounds for reversal urged on appeal were asserted in defendant's motion to dismiss the complaint and are implicit in its denial of liability in its answer. It is not apparent in what manner plaintiff was surprised, nor is there any indication as to what evidence, if any, might have been offered to refute defendant's contentions which are not factual, but legal.

■ ■ The rule, long established, is that contracts should be construed as a whole and conflicting provisions should be reconciled if possible, Agnell v. Illinois Bell Tel. Co., 342 Ill App 516, 97 NE2d 483. "Generally, words in a contract are to be given their usual and primary meaning at the time of the execution of the contract. Contracts must receive a reasonable construction according to the intention of the parties if that intention can be ascertained from their language. A reasonable construction will be preferred to one which is unreasonable." Marshall Field & Co. v. J. B. Noelle Co., 81 Ill App 2d 409, 414, 26 NE2d 454.

■ Citing Thomas Hoist Co. v. William J. Newman Co., 365 Ill 160, 6 NE2d 171; Ryan Oil Co. v. Ewald, 40 Ill App2d 145, 189 NE2d 404; Olson v. Rossetter, 330 Ill App 304, 71 NE2d 556; and Northwest Racing Ass'n v. Hunt, 20 Ill App2d 393, 156 NE2d 285, defendant argues that paragraphs 8 and 12 clearly relieve it of any liability and assuming, arguendo, that paragraph 13 can be construed to impose liability upon it, paragraphs 8 and 12 must prevail for the reason that when two clauses of a contract are so repugnant to each other that they cannot stand together, the first controls. We have ex-

amined the authorities cited and are reluctant to apply the rule for the reasons so well stated in Samuels v. Meyerovitz, 270 Ill App 210, wherein at page 214, the court said: "While the rule exists as these authorities show, it is resorted to by the courts with regret and usually in despair of finding a reasonable interpretation. As Professor Williston says, 'It is obvious, however, that such a rule is extremely artificial, and can only be accepted as a last resort.'" In our opinion, the contract can be construed in accordance with rules of construction which find firmer support in legal reasoning than does that for which defendant contends.

Applying the rule stated in Marshall Field & Co. v. Noelle (supra) we conclude that defendant cannot be held liable for the sums which plaintiff seeks to recover and the judgment must be reversed. Paragraph 8 states clearly and unequivocally that nothing shall be done which might impose liability on the defendant. Paragraph 12 clearly and unequivocally vests plaintiff with full power and authority to do and perform all acts necessary to the continued operation of J. & R.-Allison and with equal clarity requires it to protect defendant from liability in accordance with the terms of paragraph 8.

In our opinion the provisions of paragraph 13 not only do not serve to impose liability on defendant, but are inconsistent with any such construction. It provides that immediately upon the execution of the agreement defendant is to receive 68.61% of its "Investment Account." The third distribution in order of priority is a similar reduction of plaintiff's "Investment Account." Clearly, the remaining 31.39% of each party's "Investment Account" is the "cushion" out of which plaintiff was to wind up the then pending jobs. We construe the paragraph to mean that defendant's only exposure was the

loss of the 31.39% of its "Investment Account" and no further liability could be imposed upon it.

For the reasons set forth, the judgment of the Circuit Court of Jackson County is reversed and the cause is remanded to the Circuit Court of Jackson County with directions to vacate the judgment appealed from, and enter judgment in favor of the defendant Edward P. Allison Co., Inc., a corporation, and against the plaintiff, J. & R. Electric Co., a corporation, in bar of suit and for costs.

Judgment reversed and remanded with directions.

EBERSPACHER, J., concurs.

MORAN, P. J., dissenting:

The majority opinion says that "Paragraph 8 states clearly and unequivocally that nothing shall be done which might impose liability on the defendant" and holds that this language means that the defendant is exonerated from sharing in the losses even though Paragraph 10 clearly states that after all the items enumerated in Paragraph 10 are paid, the net profit or loss of the corporation shall be distributed. I disagree.

The principal purpose of the contract was to wind up the obligation of the corporation, which at that time consisted of eight jobs described in Paragraph 10 of the agreement. After these jobs were completed by J. & R. and after the parties were paid items A through E as provided by Paragraph 13, the losses were to be distributed in the same priority as the income and profits. This is the plain meaning of the contract as provided by Paragraphs 10, 11, 12 and 13 of the contract. All of the provisions of the contract, being 1 through 9 and 14, were subordinate to the main purpose of the contract which was the completion of the business of the corporation and the distribution of the profit and losses. This

is borne out by the following language from Paragraph 10:

". . . It is mutually agreed that The Corporation will continue in business hereafter for the principal purpose of completing the jobs above noted, collecting the accounts receivable, paying the accounts payable, paying the Investment Accounts, and then distributing the net profit or loss of the Corporation. The balance of this Agreement has to do with such continued operation."

Paragraphs 1, 2, 3, 5 and 6 of the contract covered the removal of the defendant from the active management and control of the business. Paragraphs 7 and 9 mutually obliged the defendant and the plaintiff to make all the necessary transfers required by the contract. Paragraph 14 required a monthly accounting to defendant.

The final remaining two paragraphs of the contract, 4 and 8, mutually obligated the defendant (in Paragraph 4) and the plaintiff (in Paragraph 8) to not deal with the assets of each other or of the corporation in such a manner as to make the other liable thereby. The obvious and evident purpose of these two paragraphs, which were ancillary to the basic purpose of the contract as stated above, was to protect the parties from each other in relation to any other business activities which they might separately be carrying on (unrelated to the winding up of the business of the corporation) and the possibility of one party involving the other on account of or in connection with their prior association together. It is obvious that these two paragraphs did not in any way relate to the winding up of the business and the distribution of the net profit or loss which was provided for in Paragraphs 10 to 13 inclusive, but pertained only to outside activities, unrelated to the corporation, that would be

carried on by the plaintiff and defendant in their continuing separate businesses.

A comparison of the language of the two paragraphs will probably illustrate this point more clearly:

Paragraph 4 reads:

"Allison further agrees that when the terms and provisions of the first two paragraphs herein have been met that it will not in any manner whatsoever deal with the assets or liabilities of J. & R., and will do nothing which might give rise to any suit, claim, claim for lien, lien, or the like whatsoever, and will not in any manner whatsoever make any contract, undertake any obligation, borrow any money, pledge any asset of any nature whatsoever, or in any way encumber any asset in any manner whatsoever of The Corporation or of J. & R. which might in any manner whatsoever make J. & R. or The Corporation liable or responsible in whole or in part therefor."

Paragraph 8 reads:

"J. & R. agrees that it will not in any manner whatsoever deal with the assets or liabilities of Allison, and will do nothing which might give rise to any suit, claim, claim for lien, or the like whatsoever, and will not in any manner whatsoever make any contract, undertake any obligation, borrow any money, pledge any asset of any nature whatsoever, or in any way encumber any asset in any manner whatsoever of The Corporation or of Allison which might in any manner whatsoever make Allison liable or responsible in whole or in part therefor."

Paragraph 4 is obviously an undertaking by Allison that Allison will not make the corporation or J. & R.

liable to others by the future operation of Allison's business, and Paragraph 8 is a mutual agreement by J. & R. that it will not in the future obligate Allison to third parties by reason of the operation of its own business or that of the corporation. By no stretch of the imagination can the language of Paragraph 4 be construed to exonerate J. & R. from sharing in the losses of the corporation, and likewise, since the language and intent of Paragraph 8 was similar to Paragraph 4, by no stretch of the imagination can the language of Paragraph 8 be construed to exonerate Allison from sharing in the future losses of the corporation.

Neither Paragraph 4 nor Paragraph 8 of the agreement pertains to a division of the profits, losses, assets or liabilities, but rather to a mutual agreement between J. & R. and Allison not to obligate each other in the future operation of each one's business. In other words, Paragraph 4 and Paragraph 8 are reciprocal agreements by Allison and J. & R. not to pledge the assets of each other to people that each may be doing business with in the future.

The intent of the parties in Paragraphs 10 and 13, when considered with the entire agreement, is clear, namely: If the windup of the business resulted in a profit that profit was to be shared by and paid to the plaintiff and the defendant and, on the other hand, if the windup resulted in a loss, that loss was to be shared by and paid for by the plaintiff and defendant.

I would affirm the judgment of the trial court.