MARTIN SPAGAT *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. DONALD S. SCHAK *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 83—949

Opinion filed January 17, 1985.

---

132

Bonnie M. Wheaton, of Wylie, Wheaton & Associates, of Wheaton, for appellants.

Harvey J. Barnett, of Harvey J. Barnett & Associates, of Chicago, for appellees.

JUSTICE SCHNAKE delivered the opinion of the court:

The defendant, Donald S. Schak, appeals from the judgment entered on July 25, 1983, in the circuit court of Du Page County which awarded the plaintiffs, Martin Spagat and Beau Monde Associates Ltd., $900,000 for breach of contract, $75,000 for return of moneys paid and $93,416 in prejudgment interest. The plaintiffs cross-appeal from the trial court's denial of punitive damages on count V of their complaint for fraud.

The case arises out of a March 19, 1979, real estate contract for the sale of an apartment complex to the plaintiffs for $6.5 million. The fee title to the property had been severed, with the defendant holding fee title to the improvements and a leasehold in the land and Property Capital Trust, a real estate investment trust, holding fee title to the land. The court, after finding that the contract was for the sale of both fee titles, held that the defendant wilfully breached the contract by failing to obtain the fee title to the land and by negotiating to sell his improvements and leasehold estate to a third party while the contract was still in effect. The defendant raises several issues on appeal.

On March 19, 1979, the plaintiff, Martin Spagat, and the defendant, Donald S. Schak, executed a real estate sales contract for the Beau Monde Apartments, a 279-unit apartment complex located in Lisle for the price of $6.5 million. The purchaser was listed as, "First Bank of Oak Park Trust #11636, Martin Spagat, beneficiary of and agent for remaining beneficiaries," although it is undisputed that this trust never came into being. The seller was listed as, "Devon Bank Trust 2120 and Donald S. Schak, sole beneficiary." The contract was

signed by Spagat and Schak individually, and Spagat gave Schak $25,000 as earnest money.

The closing date under the contract was April 20, 1979, but two later amendments extended it to August 15, 1979. In early August Martin Spagat formed an oral partnership called Beau Monde Associates Ltd. to purchase the apartment complex. The partners were himself, John Kusmiersky, Neil Tyson and Matthew Spagat. On August 15, 1979, Martin Spagat and Donald Schak executed a third amendment to the contract which increased the earnest money from $25,000 to $50,000 and extended the closing date to January 2, 1980. Spagat also orally agreed to assign to the partnership whatever rights he had in the contract. On August 28, 1979, a fourth amendment was executed which put into writing that Spagat had conveyed to the association all of his right, title and interest in the contract and on September 17, 1979, a certificate of limited partnership for Beau Monde Associates Ltd. was recorded in Du Page County.

On January 25, 1980, the parties executed a fifth amendment which again extended the closing and also required the plaintiffs to pay the defendant $10,000 then and $5,000 each month thereafter until the closing. The parties stipulated that the plaintiffs made all of the required payments, totaling $75,000.

In February or early March of 1981, Schak requested a loan confirmation from Spagat. On March 2, 1981, Kusmiersky obtained written confirmation of his $1.9 million loan from Abacus Mortgage Investment Company, and Spagat delivered the confirmation letter to Schak on the same day.

On April 1, 1981, Martin Spagat, Donald Schak and George Bigelow, a representative from Property Capital Trust, met in Spagat's office to try to agree on a price for Schak's purchase of the fee title to the land from Property Capital Trust. Bigelow stated that his investors would probably accept $950,000 to $1,000,000 for the property. This was far in excess of Schak's March 2, 1981, offer to purchase the property for $675,000, and no agreement for the sale of the fee title was reached.

On the final closing date of April 15, 1981, two full years after the closing date set in the original contract, Schak had not obtained the fee title to the land nor obtained a mortgage subordination as required by the escrow instructions. The plaintiffs, aware that the defendant could not perform the contract, did not make a formal offer of the purchase price.

On May 4, 1981, Spagat received a letter from James Kemp, Schak's attorney, claiming that the plaintiffs were in breach of con-

tract but extending the closing date to May 26, 1981. This led to a meeting between the parties at Kemp's office, where a settlement was discussed. While Spagat testified that he thought a settlement of $250,000 in his favor had been reached, Schak vehemently denied any such settlement agreement at trial.

In June or July of 1981, Schak sold his interest in the property, the fee title to the improvements and a 65-year leasehold on the land, to Anthony Navilio for $6.5 million. While Schak testified that he began negotiations for this deal in July of 1981, Navilio's attorney, Lenard Blum, testified that negotiations started in mid-April, probably between April 15 and 18.

The plaintiffs presented Eugene Stunard as an expert witness. He testified that the fair market value of the apartment complex (fee title to the land and the improvements) from April 15, 1981, through September of 1981 was $7.4 million. Schak offered no evidence on the issue of damages.

■ On appeal the defendant first argues that the court erred in finding an enforceable contract between the parties because the agreement lacked consideration, violated the statute of frauds and was too uncertain to be enforceable. We need not reach the merits of these arguments, however, since they are affirmative defenses and were waived by the defendant's failure to raise them in his answer.

Under section 2—613(d) of our Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—613(d), formerly Ill. Rev. Stat. 1981, ch. 110, par. 43(4)), if a defendant wishes to assert an affirmative defense at trial, he is required to specifically plead it so that the plaintiff is not taken by surprise. If he fails to do so, he is deemed to have waived the defense, and it cannot be considered even if the evidence suggests the existence of the defense. *Parker v. Dameika* (1939), 372 Ill. 235; *Economy Truck Sales & Service, Inc. v. Granger* (1965), 61 Ill. App. 2d 111; *Terminal Freezers, Inc. v. Roberts Frozen Foods, Inc.* (1976), 41 Ill. App. 3d 981; *M. Loeb Corp. v. Brychek* (1981), 98 Ill. App. 3d 1122.

■ The defendant argues he has not waived these defenses, relying on *J. & R. Electric Co. v. Edward P. Allison Co.* (1970), 125 Ill. App. 2d 123, and *Ricke v. Ricke* (1980), 83 Ill. App. 3d 1115. Neither case is applicable here. In *J. & R. Electric* the court held that the grounds urged for reversal were asserted in the defendant's motion to dismiss and were implicit in the defendant's answer and therefore the plaintiff was not surprised. The *Ricke* case involved a theory of recovery, not an affirmative defense.

The defendant further argues that the plaintiffs are estopped

from recovering any damages in excess of $250,000 based on the alleged settlement agreement reached in May of 1981. It is the defendant, however, who has waived the right to claim error based on the alleged settlement. The defendant vehemently denied at trial that any settlement had been reached and stipulated to the dismissal of plaintiffs' count IV which alleged the settlement agreement in the alternative. "It is fundamental to our adversarial process that a party waives his right to complain of an error where to do so is inconsistent with the position taken by the party in an earlier court proceeding." *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 543.

The defendant next contends that the court erred in finding a wilful breach on his part based on the subsequent sale of the property to a third party because he sold the property at the plaintiffs' urging. This argument, however, ignores that Navilio's attorney for this transaction, Lenard Blum, testified that negotiations between the defendant and Navilio began in mid-April, probably between April 15 and 18. Therefore, the trial court had sufficient evidence in the record to find that the defendant began negotiations to sell the property before the May 1981 meeting where the plaintiffs suggested that the defendant sell the property to raise money to pay them damages.

The defendant's third argument on appeal is that the trial court erred in finding that the plaintiffs were ready, willing and able to perform the contract because the plaintiffs' loan commitment from Abacus Mortgage Investment Company was to John Kusmiersky as an individual and there was no evidence that it would have been honored for the limited partnership. Again, the defendant ignores clear testimony in the record. Gerald Nudo, a representative of Abacus Mortgage Investment Company, testified that he knew that Kusmiersky would not be purchasing the property alone, that this was often the way Kusmiersky operated, and that it did not make any difference in their commitment to make the loan to Kusmiersky. The record, therefore, fully supports the trial court's findings.

The defendant argues in the alternative, that since neither party made a formal tender of performance, both parties were in default and neither can recover. The defendant's cited case, *Christopher v. West* (1951), 409 Ill. 131, holds to the contrary, however. In *Christopher* the buyer in a real estate deal rescinded the contract and sued for the return of his earnest money when the seller failed to supply satisfactory title. The court held that the buyer's suit was not barred because he had not made a formal tender of performance, saying:

"Inability to perform is sufficient excuse on the part of the purchaser for not tendering performance, for, in this event, a ten-

der would be devoid of meaning. [Citations.]" (49 Ill. 131, 136.) Similarly, the defendant here could not have tendered the fee title to the property on April 15, 1981, and, therefore, a formal tender by the plaintiffs was not required.

■ The defendant's fourth argument on appeal is that the plaintiffs' expert witness on damages based his opinion on impermissible factors and, therefore, his testimony was not competent evidence for the trial court's award. The alleged impermissible factors were: (1) that the expert presumed the apartment complex would be converted to condominiums and based his estimate of the fair market value on other apartment complexes that had been converted, (2) that he based his estimate on the sale of the entire complex, including the fee title to the land, and (3) that he based his estimate on projected vacancy rates and maintenance costs and not on the actual current vacancy rates and maintenance costs.

As to the defendant's first contention, the plaintiffs' expert testified that he considered a number of factors in giving his estimate, including the value of the property as rental property, as condo conversion property, and as investment property. The expert's consideration of the value of the property for condo conversions was proper since the expert testified that the possibility of condo conversion was a factor in the marketplace that would affect its fair market value. Nor was the fact that the expert based his estimate on the fee title improper, because the trial court found that the contract was for the sale of the fee title and not just the remaining 65 years of the defendant's lease.

The plaintiffs' expert also explained the use of projected vacancy rates and maintenance costs rather than the actual rates and costs. To get an estimate of the fair market value, he had to estimate its income-producing ability over a future period of 5 to 15 years and this required an estimate of the average vacancy rate over those years. A proper estimate could not be based on the current rate, since that could be well over or under the average rate at any given time. For similar reasons, an estimate of maintenance costs is used rather than the current maintenance costs. In view of the facts of this case, we believe that these factors were relevant in estimating the fair market value of the property.

■ The defendant also argues that the plaintiffs' expert witness based his opinion on hearsay and, therefore, his opinion cannot support the trial court's damage award. We do not reach the merits of this argument because the defendant failed to object to the expert's testimony at trial and therefore waived the issue. *Graves v. North*

*Shore Gas Co.* (1981), 98 Ill. App. 3d 964, 973.

■ The defendant's last argument is that the trial court erred in granting the plaintiffs prejudgment interest. Section 2 of "An Act in relation to the rate of interest and other charges in connection with sales on credit and the lending of money" (Ill. Rev. Stat. 1981, ch. 17, par. 6402) states:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing *** ."

Under this statute the plaintiffs argue the real estate contract was an "instrument of writing" and therefore, the statute allows prejudgment interest in this case.

Even if the real estate contract meets the statutory requirement for an "instrument of writing," it must also meet a second requirement that the amount due be a fixed or easily ascertainable amount, in the sense that a debtor-creditor relationship exists. (*Cushman & Wakefield of Illinois, Inc. v. Northbrook 500 Ltd. Partnership* (1983), 112 Ill. App. 3d 951; *Stevenson v. ITT Harper, Inc.* (1977), 51 Ill. App. 3d 568; *Kansas Quality Construction, Inc. v. Chiasson* (1969), 112 Ill. App. 2d 277.) Prejudgment interest is not allowed on unliquidated claims even if the claim is based on an instrument of writing.

Plaintiffs rely on the case of *Keystone Steel & Wire Co. v. Price Iron & Steel Co.* (1952), 345 Ill. App. 305, for the proposition that damages ascertainable by computing the difference between the contract price and the fair market value of the property are sufficiently liquidated to base prejudgment interest on. *Keystone* was a breach of contract action based on the defendant's failure to supply scrap steel as provided in the contract, thereby requiring the plaintiff to buy scrap steel from other more expensive sources. However, in *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, the Appellate Court for the First District distinguished its earlier *Keystone* decision, stating:

> "We see the instant case as presenting a distinguishable situation, however. In *Keystone Steel* and *Norton Iron Works,* the contract price was fixed and not disputed; whereas, here the contract price was sharply disputed since it was contingent upon which credits were allowed and for what amount, *and the market value of the property was also disputable.*" (Emphasis added.) 84 Ill. App. 3d 791, 809-10.

■ In *North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530, the trial court held that the marine owner had converted the

defendant's boat and awarded him damages of $15,561. On appeal, the defendant tried to justify the excess damage award as prejudgment interest, but this court, after finding that the fair market value of the boat was only $12,500, held that the excess damage award could not be justified as prejudgment interest, stating:

> "In this case, since the amount owing is based upon the value of the boat at the time of the conversion, an amount which is not easily ascertainable, prejudgment interest would not be proper." (81 Ill. App. 3d 530, 535.)

Similarly in this case, the amount of damages required expert testimony as to the value of the property at the time of the breach. Since this amount was not fixed or easily ascertainable, prejudgment interest was not properly granted.

■ The $75,000 which the plaintiffs paid to Schak under the January 25, 1980, amendment, however, presents a different matter. Plaintiffs' claim for the return of this money is based on an "instrument of writing" under the statute, but, unlike the contract damages awarded at trial, the amount due was certain. Therefore, the trial court's award of interest on this amount was proper under the statute.

■ The second basis upon which the plaintiffs seek to uphold the trial court's granting of prejudgment interest is the court's equity power to grant prejudgment interest where required to do justice. (*City of Springfield v. Allphin* (1980), 82 Ill. 2d 571, 579.) The plaintiffs fail to set out, however, the basis for their claim that the trial court was acting in equity when it granted the plaintiffs $900,000 in damages for breach of contract. The record shows that on April 14, 1982, the court dismissed, with prejudice, all claims for equitable relief, and further, that the plaintiffs' damages were based on the legal claim of breach of contract. Plaintiffs' recovery was in law and not in equity, and, therefore, the equitable principles upon which the plaintiffs attempt to rely are not applicable here.

### PLAINTIFFS' CROSS-APPEAL

In his findings, the trial judge stated orally in court:

> "I have in this ruling denied any punitive damages to the plaintiff despite the fact that the evidence shows that the breach by the defendant was wilful.
>
> If, in fact, punitive damages were recoverable, the evidence indicates that a proper amount of punitive damages would be twice the amount of interest paid under the sale contract entered into by defendant and Mr. Navilio since the time of pay-

ments thereunder."

Later in the hearing on prejudgment interest, the court stated:

"THE COURT: What was my finding as far as the judgment?

MR. MALONEY: That there was a willful breach.

THE COURT: In essence fraud and I denied it because of breach of contract. My understanding of the law is you cannot get punitive damages even if there is a willful or fraudulent breach of the contract.

Go ahead. That is the reason I dismissed the case and not because of the evidence."

■■■ The plaintiffs argue, based on these statements, that the trial judge found an independent wilful tort. We do not apprehend, however, that the judge's remarks amount to a finding of an independent wilful tort. The judge's only specific finding was that the defendant wilfully breached the contract, and not every wilful breach of contract is an independent wilful tort. Further, even if we were to read the judge's remarks as the plaintiffs argue, we cannot say it was error for him to deny punitive damages. When a party proves sufficiently serious misconduct to warrant punitive damages, it is for the trier of fact to decide from all the facts and circumstances, including whether the case requires more than compensatory damages, whether to award punitive damages. Absent an abuse of discretion, this determination will not be disturbed by a reviewing court. (*Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14; *Rauwolf v. Travelers Indemnity Co.* (1974), 20 Ill. App. 3d 226.) We cannot find that the trial judge abused his discretion here.

For the reasons stated above, the judgment of the trial court is affirmed in part, reversed in part and remanded for directions that the trial court reduce the total judgment by the amount of $82,356.87 which it awarded as prejudgment interest on the $900,000 judgment.

Affirmed in part, reversed in part and remanded with directions.

LINDBERG and UNVERZAGT, JJ., concur.