FEDERAL DEPOSIT INSURANCE COR-PORATION, as Receiver of New Bank of New England, N.A., Plaintiff,

v.

FEDDERS AIR CONDITIONING, USA, INC., and the Sherwin–Williams Company, Defendants.

FEDDERS AIR CONDITIONING, USA, INC., Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE COR-PORATION, as Receiver of Bank of New England, N.A., and as Receiver of New Bank of New England, N.A., and Fleet Bank of Massachusetts, N.A., Defendants.

Civ. A. Nos. 91–12131–K, 92–10769–K.

United States District Court,
D. Massachusetts.

May 11, 1993.

Kathleen C. Stone, Robinson & Cole, Robert A. Stolzberg, Charmoy, Stolzberg & Holian, Boston, MA, for plaintiff.

Robert D. Cohan, David J. Rasnick, Cohan & Rasnick, Kevin F. Moloney, Barron & Stadfeld, Boston, MA, for Fedders Air Conditioning, U.S.A., Inc.

Richard D. Belin, Foley, Hoag & Eliot, Boston, MA, Mitchell A. Orpett, Tribler & Orpett, P.C., Chicago, IL, John Lebold, Ronald Tamburrino, Cleveland, OH, for Sherwin–Williams Co.

**Additional Findings of Fact Bearing on Civil Action No. 92–10769–K, and Conclusions of Law in Civil Action No. 92–10769–K and No. 91–12131–K**

KEETON, District Judge.

Fedders Air Conditioning, USA, Inc. ("Fedders") filed Civil Action No. 92–10769–K on April 2, 1992, against the Federal Deposit Insurance Corporation ("FDIC"), in the capacities stated in the title, and against Fleet Bank of Massachusetts, N.A., challenging FDIC's decision to disallow claims received from Fedders on October 16, 1991. Fedders acted under 12 U.S.C. § 1821(d)(6), alleging that defendants misappropriated $250,000 plus interest from an escrow account that was to have been created in connection with Fedders' sale of a warehouse to Liberty Effingham Limited Partnership ("Liberty") on December 30, 1986.

On August 14, 1992, this court consolidated Civil Action No. 92–10769–K with Civil Action No. 91–12131–K for purposes of all pretrial proceedings, and on February 25, 1993 the cases were provisionally consolidated for trial. Under the latter order, the cases were tried before the court without a jury, partly together and partly in sequence, on April 12–16 and 28, 1993. In Civil Action No. 92–10769–K, Fedders seeks declaratory relief and damages for breach of contract, breach of fiduciary duty, and unjust enrichment. For the reasons explained below, I find that in Civil Action No. 92–10769–K Fedders failed to meet its burden of showing that it is entitled to relief.

**I. Findings of Fact**

Findings of fact bearing upon most issues in Civil Action No. 91–12131–K and in part as well on issues in Civil Action No. 92–10769–K were stated orally on the record on April 16,

1993. Additional findings bearing especially on Civil Action No. 92–10769–K are stated here. Some findings of background facts essential to understanding the issues in Civil Action No. 92–10769–K, though already stated on the record orally, are repeated and explained here in more detail.

On December 1, 1986, Fedders and Liberty signed a Purchase and Sale Agreement for the sale to Liberty by Fedders of a warehouse in Effingham, Illinois. Under the terms of the agreement, Liberty was to assume Fedders' obligations under an existing lease (to The Sherwin–Williams Company, hereinafter "Sherwin–Williams," as lessee) in exchange for which Fedders would indemnify Liberty against any loss or expense incurred as a result of any claim arising under specified provisions of the lease between the warehouse owner and the lessee (Sherwin–Williams). In particular, Paragraph 31 of the lease required that repairs be made to the warehouse roof because of leaks.

The parties agreed that Fedders would make the roof repairs at its own expense, the roof to be "completely repaired, as required, to eliminate any leakage." As security for Fedders' performance of these repairs, Fedders, Liberty and the Bank of New England ("BNE") entered into an escrow agreement under which Fedders was to deposit at closing $250,000 of the purchase price into an escrow account with BNE.

Liberty and its successors in interest have claimed that the required repairs were never made. These circumstances formed the basis for Liberty's subsequent refusal to authorize the release of escrow funds to Fedders, and the ensuing law suit between the parties for breach of contract, misrepresentation, and fraud (Civil Action No. 91–12131–K).

The purchase price of the warehouse was 7 million dollars. Of this sum, $50,000 had already been paid to Fedders as a deposit, leaving a balance of $6,950,000 to be paid at closing. Liberty was to receive a loan from BNE in the amount of 6.7 million dollars. The additional $250,000 was to be paid by Liberty to BNE from another source (probably another account with BNE), and then transmitted by BNE to Dale Wolff, Esquire (the "closing agent"), for further transmis-

sion to Fedders at closing, along with the $6,700,000 loan proceeds. From the total purchase price delivered to Fedders, Fedders was to return $250,000 to BNE to be placed in the above-described escrow account.

The closing took place on or about December 30, 1986. During the weeks immediately preceding the closing, it was agreed among all parties that Wolff would not handle the $250,000 that was to go into the escrow account. This agreement was reached in order to avoid the circularity and delay of passing the $250,000 from BNE to Wolff to Fedders to Wolff and back to BNE for placement in the escrow account. Electronic entries and transfers such as were contemplated by the parties, in lieu of transfers of cash or checks, are typical in a multi-transaction real estate closing, and in this instance were designed to simplify Fedders' receiving the benefit of the full purchase price while transferring $250,000 into the escrow account.

I find, on compelling circumstantial evidence, that the parties implicitly manifested an agreement among themselves (though the parties left this to be inferred from their communications rather than being spelled out explicitly) that BNE would make in BNE's electronic accounts (the modern equivalent of "books" maintained under a double-entry debit-credit system) a debit entry of $6,700,000 (the amount of the promissory note received by BNE from Liberty), balanced by the sum of two credits:

*first,* a $6,450,000 credit entered to reflect BNE's obligation to deliver cash (or a check or an electronic transfer) to Wolff on behalf of Liberty, for further delivery by Wolff to Fedders and others at closing (with the expectation also that debit-credit offsetting entries would be made on BNE's books when the disbursement to Wolff in discharge of that obligation occurred); and

*second,* a $250,000 credit into an escrow account on BNE's "books," with Fedders as the depositor.

Instead, though taking Liberty's promissory note in the amount of $6,700,000, BNE merely entered electronically a $6,450,000 debit in the Liberty loan account and a corre-

sponding credit of $6,450,000. See ¶ 10 of the Joint Stipulation of Facts, Docket No. 107.

Even though BNE never made the electronic entries required to set up the escrow account in the BNE electronic records, BNE did sign and deliver a document, through the "closing agent" Wolff, declaring that it had set up the escrow account. An executed copy of this document (produced from the records of another party) is in evidence. BNE's copy of this document, however, has not been produced during this trial, nor has any evidence been presented that it was found in the search of BNE records during preparations for this trial. The circumstantial evidence that BNE held such a copy in its records is compelling, however, and I so find.

Thus, in summary, I find that BNE delivered to others and held in its files a copy of a formal acknowledgment that it had set up the escrow account, but it never in fact set up the account in its electronic records. There is no evidence before the court to suggest that BNE or its successors (before a time well into this litigation) ever discovered or made any effort to correct (a) BNE's error, (b) the resulting lack of an escrow account in the electronic records of BNE, and (c) the resulting disparity between the amount of Liberty's note and the $6,450,000 reflected in BNE's electronic records as the amount of the loan to Liberty.

On January 6, 1991, BNE was declared insolvent and FDIC was appointed as receiver. FDIC subsequently entered into a Purchase and Assumption Agreement with the New Bank of New England ("NBNE"), which was established as a bridge bank to assume certain liabilities of BNE as set forth in the Purchase and Assumption Agreement dated January 6, 1991. On July 13, 1991, NBNE was closed and FDIC was appointed as receiver. FDIC next entered into an agreement with Fleet Bank of Massachusetts, N.A. ("Fleet") that I find on circumstantial evidence (the precise terms of the document not being in evidence) created a legal relationship between FDIC and Fleet similar to that created by the Purchase and Assumption Agreement between FDIC and NBNE.

The statutory deadline for filing claims against the FDIC as receiver for BNE was May 25, 1991. Fedders claims that it was not until August 2, 1991 that it first became aware that there might be a problem with the escrow account. I find from the evidence before the court, however, that Fedders was aware as early as April 8, 1991 of at least the possibility that BNE had not set up the escrow account in its electronic records, and that by May 15, 1991 Fedders had sufficient information about the escrow account problem to be able to recognize the need to take appropriate legal action.

On October 11, 1991, Fedders filed Proofs of Claim with FDIC pursuant to 12 U.S.C. § 1821(d) for the $250,000 withheld at closing, plus accrued interest. On February 19, 1992, FDIC disallowed Fedders' claim against FDIC as receiver of BNE on the grounds that Fedders had missed the statutory deadline for filing its claim. 12 U.S.C. 1821(d)(3)(B). On February 20, 1992, FDIC disallowed Fedders' claim against FDIC as receiver of NBNE on the grounds that "the liability to fund and maintain the escrow deposit arose under the terms of an agreement dated December 30, 1986, and, as such, would have been a contractual liability of [BNE], [which] did not pass to [NBNE] and such claim does not constitute a claim against the receivership of [NBNE]." Civil Action No. 92–10769–K followed.

## II. Conclusions of Law

### A. *Civil Action No. 92–10769–K*

■ The FDIC, in its capacity as receiver for a failed bank, acts principally to protect insured depositors. *Federal Deposit Ins. Corp. v. La Rambla Shopping Center, Inc.*, 791 F.2d 215, 218 (1st Cir.1986). To carry out this function, FDIC will often enter into a "purchase and assumption" arrangement with another bank. *Id.* This typically occurs as follows:

> [T]he FDIC, in its capacity as receiver, sells the [failed] bank's healthy assets to the purchasing bank in exchange for the purchasing bank's promise to pay the failed bank's depositors. In addition, as

receiver, the FDIC sells the "bad" assets to itself acting in its corporate capacity. With the money it receives, the FDIC-receiver then pays the purchasing bank enough money to make up the difference between what it must pay out to the failed bank's depositors, and what the purchasing bank was willing to pay for the good assets that it purchased. The FDIC acting in its corporate capacity then tries to collect on the bad assets to minimize the loss to the insurance fund. Generally, the purchase and assumption must be executed in great haste, often overnight.

*Timberland Design, Inc. v. First Service Bank for Savings*, 932 F.2d 46, 48 (1st Cir. 1991) (citing *La Rambla Shopping Center*, 791 F.2d at 218).

On January 6, 1991, FDIC, as receiver for BNE, signed a Purchase and Assumption Agreement with NBNE. Under the terms of that Agreement, the only relevant liabilities assumed by NBNE were "deposit" liabilities, as set forth in Article II, Section 2.1. The term "deposit" is defined in Article I, Section 1.9 of the Agreement as "a deposit as defined in 12 U.S.C. Section 1813(1), including, without limitation, all uncollected items *included in the depositors' balances and credited on the books of the Failed Bank* ...". (emphasis added). The statute defines a deposit as "money received or held by a bank or savings association, or the credit given for money or its equivalent received or held by a bank or savings association, in the usual course of business for a special or specific purpose, regardless of the legal relationship thereby established, including without being limited to, escrow funds...." 12 U.S.C. § 1813(*l*).

■ Regardless of the way one might characterize BNE's errors in record-keeping associated with the closing of the Effingham warehouse property on December 30, 1986, I cannot conclude that a "deposit" was made into an escrow account within the meaning of 12 U.S.C. § 1813(*l*). The escrow account that BNE was contractually bound to create and formally acknowledged that it had created was in fact never created. Fedders therefore never acquired the status of a "depositor," in the sense relevant to the present

litigation, notwithstanding BNE's assurances in the Escrow Agreement. Consequently, FDIC as receiver did not succeed to any "deposit" liability associated with the phantom escrow account, nor did FDIC pass on any "deposit" liability either to NBNE, under the terms of the January 1991 Purchase and Assumption Agreement, or later to Fleet.

I recognize that Article I, Section 1.5 of the FDIC–NBNE Purchase and Assumption Agreement defines "Book Value" as "the dollar amount stated on the books of the Failed Bank as of Bank Closing, after adjustment by the Receiver for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections." I recognize, also, that it might be argued that the phantom escrow account constituted an "unposted credit" on BNE's books and thus a deduction to be made in determining adjusted "Book Value" as defined in Article I, Section 1.5 of the FDIC–NBNE Purchase and Assumption Agreement (balanced, however, by the "unposted" $250,-000 "debit" to be added to the Liberty loan account on BNE's books). I conclude, however, that "unposted debits and credits" cannot fairly be construed as applying to items remaining unposted for as long a period preceding the Purchase and Assumption Agreement as was the case with the debits and credits that would have created the escrow account in this case (i.e., 4 years).

■ Fedders may have had a valid claim against FDIC as receiver of BNE at one time. That is, even though not succeeding to a "deposit" liability, FDIC may have succeeded to a contractual liability of BNE growing out of BNE's agreement to create the escrow account and the false assurance that it had done so. Under 12 U.S.C. § 1821(d)(2)(H), FDIC, as receiver, is required to "pay all valid obligations of the insured depository institution." Fedders' claim against FDIC as receiver for BNE, however, was not filed within the time limits allowed under 12 U.S.C. § 1821(d)(3)–(5), and therefore is barred.

Under 12 U.S.C. § 1821(d)(3)(B)(i), FDIC as receiver is required to "promptly publish a

notice to the depository institution's creditors to present their claims, together with proof, to the receiver by a date specified in the notice which shall be not less than 90 days after the publication of such notice...." Fedders has argued that the formal publication of notice and such actual notice as it received were insufficient because it had no way of knowing its claim was not one for a "deposit." I find, however, that Fedders had learned some time before the May 25, 1991 statutory deadline for filing claims with FDIC that BNE probably had not set up the escrow account in its electronic records. Despite this knowledge, Fedders did not file its Proof of Claim until October 11, 1991, some four and a half months after the filing deadline had passed.

The strict requirements for submitting claims to the FDIC under 12 U.S.C. § 1821(d) are unambiguous, and require a finding in this case that Fedders is not entitled to its requested relief. I am not aware of any legal authority that might serve as a basis for relaxing the statutory rule in this particular case.

This result may seem harsh. Congress no doubt contemplated some harsh outcomes, however, when faced with "mountainous bank failures" and the need to stabilize the industry. *Howell v. Federal Deposit Ins. Corp.*, 986 F.2d 569, 572 (1st Cir.1993). Indeed, the overall statutory scheme governing the rights and obligations of the FDIC contains numerous provisions that potentially limit what might otherwise be meritorious claims. *See, e.g.*, 12 U.S.C. § 1823(e) (establishing rigorous requirements for enforcing asset-diminishing agreements against FDIC); 12 U.S.C. § 1821(e) (authorizing FDIC to repudiate preexisting contracts determined to be burdensome). A court is obliged to respect these bright-line rules wherever they apply to the facts of the case before the court.

For the foregoing reasons, the court orders that the Clerk enter judgment for the defendants in Civil Action No. 92–10769–K.

### B. *Civil Action No. 91–12131–K*

#### *Prejudgment Interest*

■■ The general rule under Illinois law is that prejudgment interest "cannot be awarded unless provided by statute or agreement of the parties." *Smith v. Navistar International Transportation Corporation*, 957 F.2d 1439, 1446 (7th Cir.1992) (quoting *U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1376 (7th Cir.1985)); *see also Congregation of Passion, Holy Cross Province v. Touche Ross & Co.*, 224 Ill.App.3d 559, 590, 166 Ill.Dec. 642, 663, 586 N.E.2d 600, 621 (1st Dist.1991), *appeal allowed*, 144 Ill.2d 632, 169 Ill.Dec. 140, 591 N.E.2d 20 (1992). However, "even if authorized by statute, interest can only be awarded if the damages amount is fixed or easily computable." *Smith*, 957 F.2d at 1446 (quoting *U.C. Castings Co.*, 754 F.2d at 1376). It follows that "prejudgment interest is not allowed on unliquidated claims even if the claim is based on an instrument of writing." *Spagat v. Schak*, 130 Ill.App.3d 130, 137, 85 Ill.Dec. 389, 395, 473 N.E.2d 988, 994 (2d Dist.1985).

The Illinois courts have generally acknowledged that damages calculated on the basis of fair market value are not sufficiently "fixed or easily computable" to justify an award of prejudgment interest. *See Spagat*, 130 Ill.App.3d at 138, 85 Ill.Dec. at 395, 473 N.E.2d at 994 (prejudgment interest not properly granted where amount of damages required expert testimony of property value at time of breach); *Farwell Construction Co. v. Ticktin*, 84 Ill.App.3d 791, 39 Ill.Dec. 916, 405 N.E.2d 1051 (1st Dist.1980) (prejudgment interest not properly granted where market value of property disputable); *North Shore Marine, Inc. v. Engel*, 81 Ill.App.3d 530, 36 Ill.Dec. 588, 401 N.E.2d 269 (2d Dist. 1980) (prejudgment interest not properly granted where amount of damages based on value of property at time of wrongful conversion).

■ The damages in Civil Action No. 91–12131–K reflect this court's estimate of the costs Fedders would have incurred had it actually repaired the roof of the Effingham warehouse in accordance with its contractual obligations to Liberty under the Purchase and Sale Agreement between the parties. As stated orally on the record, I have found, based on all the evidence before the court, including extensive expert testimony by roofing experts, that for Fedders to have met its

contractual obligations would have required at a minimum the placement of a membrane covering over the entire surface of the roof.

The precise nature of the repairs that would have been needed to "eliminate any leakage" from the roof was hotly disputed by the parties, as was the amount of money required to pay for such repairs. I must therefore conclude that, under the standard established in Illinois law, the amount of damages in Civil Action No. 91–12131–K was not sufficiently "fixed or easily computable" to justify an award of prejudgment interest in this case.

*Attorney Fees*

■ FDIC in Civil Action No. 91–12131–K originally sought to recover $165,000 in attorney fees. This amount represents *all* attorney fees that Liberty (and FDIC as Liberty's successor in interest) incurred in connection with Civil Action No. 91–12131–K, including not only those attorney fees that Liberty (and FDIC as Liberty's successor in interest) incurred in defending claims by Sherwin–Williams arising under the lease, but also those attorney fees that Liberty (and FDIC as Liberty's successor in interest) incurred in bringing its claim against Fedders.

In American law, however, it is generally the case that harms "caused" by wrongful conduct do not include attorney fees incurred in an action against the wrongdoer. One of the judicially developed rules of law founded on this principle (the "American Rule") is that attorney fees are ordinarily recoverable only when a statute or contract so provides. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717, 87 S.Ct. 1404, 1406, 18 L.Ed.2d 475 (1967).

It is, of course, true that in a broad cause-in-fact sense, one party's wrongful conduct can be seen as a cause (among others) of the ensuing cost incurred by the other party of hiring an attorney to sue the wrongdoing party to recover compensation. American legislatures and courts, however, have recognized and responded to public policy reasons for disallowing claims for attorney fees by successful litigants. *Id.* at 718, 87 S.Ct. at 1407 ("[S]ince litigation is at best uncertain one should not be penalized for merely de-

fending or prosecuting a lawsuit.") American law thus does not treat attorney fees incurred to enforce one's rights against a wrongdoer as part of the harm "caused" by the wrongdoer.

The Illinois courts have consistently applied the "American Rule" regarding attorney fees. *See Kerns v. Engelke*, 76 Ill.2d 154, 166, 28 Ill.Dec. 500, 506, 390 N.E.2d 859, 865 (1979) (quoting *Ritter v. Ritter*, 381 Ill. 549, 553, 46 N.E.2d 41, 43 (1943)) ("The law in Illinois clearly is that absent a statute or a contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.' ").

FDIC contends in the present case that Paragraph "1." of the Indemnity Agreement by Fedders dated December 30, 1986 brings FDIC's claim for attorney fees within a recognized exception to the "American Rule". Paragraph "1." provides, in relevant part:

In consideration of Liberty's guarantee of performance of landlord's obligations under the Lease, Fedders hereby agrees to indemnify and hold Liberty harmless from and against any loss, cost or expense incurred by Liberty, including reasonable attorneys' fees, resulting from any claim or cause of action under the Lease arising prior to the date of this Agreement …

One could conceivably read Paragraph "1." of the Indemnity Agreement as allowing compensation to Liberty for not only the attorney fees Liberty incurs in defending a claim brought against Liberty by the lessee (Sherwin–Williams), but also any attorney fees Liberty (or FDIC as Liberty's successor in interest) incurs in connection with asserting a claim against Fedders as a separate cause of action. Paragraph "1." of the Indemnity Agreement, however, must be interpreted in the context of a legal system in which attorney fees incurred by the indemnitee to enforce an indemnity agreement against the indemnitor are ordinarily not recoverable.

Given this context, I conclude that it is inappropriate to interpret the Indemnity Agreement in the present case as having manifested mutual intent by the parties that Fedders indemnify Liberty for attorney fees

beyond those incurred in defending a claim against Liberty by the lessee (Sherwin–Williams). I read it, instead, as providing for the more limited purpose of reimbursement of attorney fees related only to defending against claims by the lessee (Sherwin–Williams), and not attorney fees incurred by Liberty (or FDIC as Liberty's successor in interest) in asserting a claim against Fedders. This reading is reinforced by the phrase, in Paragraph "1." of the Indemnity Agreement, "hold Liberty harmless from . . . cost or expense . . . resulting from any claim . . . under the lease." This interpretation is also consistent with holdings in other jurisdictions. *See, e.g., Hooper Associates, Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905, 549 N.Y.S.2d 365, 367 (1989) ("Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise.")

Having stated on the record at trial its tentative conclusion on this issue, the court allowed additional submissions by the parties regarding the amount of attorney fees properly attributable to Liberty's defending against Sherwin–Williams' claim. FDIC subsequently estimated in a letter to the court dated April 28, 1993 that "50% of [its] total attorney time submitted was spent defending the claims and counterclaims of The Sherwin–Williams Company."

I cannot and do not accept as a basis for a finding on this issue an unsubstantiated general estimate in an unsworn statement from FDIC's counsel. I do find, however, that it is appropriate for me, rather than totally denying a claim that is at least partially justified, to make the best determination I can on the record before me as to the sum that I find to be supportable by a preponderance of the evidence. This is fair to defendant Fedders because of the circumstantial evidence supporting my finding and the absence of evidence to the contrary. It is fair to FDIC because the issue is one on which FDIC has the burden of proof, and the allowance I make is the most that I can, as factfinder, find to be supported by a preponderance of the evidence before me, including all the evidence FDIC has adduced.

I note also that proceeding on this basis is consistent with guiding precedents. This is not a statutory award of attorney fees that must meet the First Circuit's requirement of support in contemporaneous time records. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984) (Absence of detailed contemporaneous time records absent extraordinary circumstances justifies substantial reduction or disallowance of attorney fee award). Instead, the award in this instance more closely resembles an award of attorney fees under Mass.Gen.L. ch. 93A. *See, e.g., Computer Systems Engineering, Inc. v. Qantel Corporation,* 571 F.Supp. 1379, 1381 (D.Mass.1983), *aff'd,* 740 F.2d 59 (1st Cir. 1984) (Attorney fees awarded to plaintiff as part of judgment against defendant should equal what "services were objectively worth"; Massachusetts precedents allow court to take into account its knowledge of the course of the litigation rather than depending solely on affidavits or other evidence).

Proceeding as factfinder under the standard explained in the preceding paragraphs, I find that an award of $64,855.91 is a fair and reasonable sum to compensate for the attorney fees incurred by FDIC "resulting from any claim or cause of action under the Lease" asserted by Sherwin–Williams against FDIC as successor in interest to Liberty. This amount represents the sum of two separate calculations.

The $165,000 in attorney fees FDIC initially sought to recover represents the sum of two figures:

(1) approximately $93,000 consists of fees incurred directly by FDIC as receiver of BNE and NBNE, respectively, and

(2) $72,000 represents the approximate sum of five separate invoices to Liberty from its counsel for services rendered during a period beginning approximately April 1, 1988 and ending March 31, 1991.

As explained previously, FDIC has estimated that it is entitled to an award of approximately 50% of this $165,000 sum, or $82,500.

With regard to the $93,000 in attorney fees incurred directly by FDIC, I find by a preponderance of the evidence that $39,375 (of the $46,500 FDIC now seeks) is attributable to FDIC's defense of claims by Sherwin–Williams arising under the lease. This figure represents 50% of the fees incurred by FDIC through December 31, 1992 (i.e., $32,250) plus 25% of the fees incurred by FDIC from January 1 through April 8, 1993 (i.e., $7,125).

I find that "50%" as the percentage amount allocable to costs incurred by FDIC in defending against Sherwin–Williams' claims through 1992 is supported by the record in this case (including the Docket Sheet). Given the number and kind of motions entered on the Docket between August 12, 1991 (the date FDIC's notice of removal was filed) and December 31, 1992, I draw the inference that approximately equal time was spent by FDIC's counsel between defending Sherwin–Williams' claims and claiming against Fedders. Although there is some suggestion in the Docket Sheet that more time may have been spent by FDIC in defending against Sherwin–Williams' claims than claiming against Fedders, 50% is the maximum figure that I can find to be adequately supported by the record.

The election of 25% as the percentage amount allocable to costs incurred by FDIC in defending against Sherwin–Williams' claims from January 1 through April 8, 1993 is appropriate, because there is no evidence before the court to overcome the reasonable inference that fees incurred during this time period were weighted more heavily in the direction of claiming against Fedders, particularly after settlement of Sherwin–Williams' claims was virtually assured (i.e., some time

before April 2, 1993). I note also that FDIC undoubtedly spent a considerable amount of time on its claim against Fedders during the week directly preceding trial (i.e., April 5–8, 1993).

With regard to the $72,000 in attorney fees incurred by Liberty (and FDIC as Liberty's successor in interest) from April 1, 1988 through March 31, 1991, I find by a preponderance of the evidence that only $25,480.91 (of the $36,000 FDIC now seeks) is attributable to Liberty's defense of claims by Sherwin–Williams arising under the lease. As a preliminary matter, I note that FDIC has fully succeeded to Liberty's right of indemnification from Fedders for claims arising under the lease. Accordingly, any attorney fees charged to and paid by Liberty throughout the course of this litigation, and for which Liberty would properly be compensated under the Fedders Indemnification Agreement, are properly awardable to FDIC as Liberty's successor in interest. It is on this basis that I am able to consider evidence of the attorney fees billed to and paid by Liberty before FDIC's counsel assumed a principal role in this litigation.

FDIC's estimate of 50% notwithstanding, I conclude that the record before the court does not support a finding that as much as 50% of the attorney fees billed to and paid by Liberty (and FDIC as Liberty's successor in interest) between April 1, 1988 and March 31, 1991 are attributable to Liberty's defense of claims by Sherwin–Williams arising under the lease. Rather, I read the invoices from Liberty's counsel as yielding the following percentages and corresponding monetary values:

| Invoice Date | Invoice Total | Percentage Attributable to Sherwin–Williams' Claims | Monetary Value |
|---|---|---|---|
| 4/1/88 | $ 8,988.93 | 25% | $ 2,247.23 |
| 2/24/89 | $23,585.13 | 50% | $11,792.56 |
| 8/8/90 | $24,874.85 | 35% | $ 8,706.20 |
| 3/4/91 | $10,113.99 | 20% | $ 2,022.80 |
| 4/3/91 | $ 4,747.50 | 15% | $ 712.12 |
| | | | $25,480.91 |

I note that the reporting format used in each invoice (i.e., a single paragraph forming a composite of multiple entries, followed by a total monetary value for the entire composite) creates ambiguities, making it exceedingly difficult in some instances for a factfinder to make precise attributions of individual entries as between the two types of claims at issue here. For example, repeated references are made to "conferences and meetings" with Edward Bell (Liberty's principal negotiator in the Effingham property transaction), whose role in this litigation was sufficiently multifarious that it is virtually impossible to determine in any given instance the precise nature of such "conferences and meetings." Because FDIC (as Liberty's successor in interest) has the burden of proof on this issue and has failed to provide the court with information that would facilitate this task of attribution, I find it appropriate to resolve such ambiguities against the FDIC. I have done so in arriving at the percentage estimates stated here.

### Damages

In findings previously stated orally on the record, damages for the breach by Fedders of its agreement to repair the roof were determined to be $775,000. Taking into account the previously announced findings as well as those stated in this Memorandum, the court orders that the Clerk enter judgment in Civil Action No. 91–12131–K as follows:

1. Judgment for plaintiff FDIC, as receiver of NBNE, on Count I and Count III of FDIC's First Amended Complaint in the amount of $839,855.91, calculated as follows:

| Damages: | $775,000.00 |
|---|---|
| Attorney Fees: | $ 64,855.91 |
| TOTAL: | $839,855.91 |

2. Postjudgment interest on the judgment awarded in (1) accrues at the rate of 3.25 percent per annum from the date of this judgment until payment.

3. Count II and Count IV of plaintiff's First Amended Complaint are dismissed.

4. Defendant Sherwin–Williams recovers from defendant Fedders on Sherwin–Williams' First Counterclaim, Second Counterclaim, Third Counterclaim and First Crossclaim the sum of $250,000. To the extent said claims are pleaded against plaintiff FDIC, they are dismissed.

5. Plaintiff-in-counterclaim Fedders' Counterclaim/Crossclaim for declaratory and other relief is dismissed.

6. All other claims, counterclaims and crossclaims are dismissed.