CONGREGATION OF THE PASSION, HOLY CROSS PROVINCE, Plaintiff-Appellee and Cross-Plaintiff-Appellant, v. TOUCHE ROSS AND COMPANY, Defendant-Appellant and Cross-Defendant-Appellee.

First District (1st Division)   No. 1—89—0922

Opinion filed December 30, 1991.

Bell, Boyd & Lloyd, of Chicago (Francis J. Higgins, Daniel Barr, Michael A. Forti, and Todd M. Kossow, of counsel), for appellant.

McBride, Baker & Coles and Freeborn & Peters, both of Chicago (Thomas P. Ward, David C. Gustman, Leland W. Hutchinson, Jr., Beverly L. Bailey, and Andra K. Heller, of counsel), for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Following trial, the jury returned a verdict of liability against defendant-appellant/cross-defendant-appellee, Touche Ross & Company (hereafter Touche Ross) in favor of plaintiff-appellee/cross-plaintiff-appellant, Congregation of the Passion, Holy Cross Province (hereafter Congregation), on count I, sounding in accounting malpractice/negligence and assessed monetary damages in the amount of $3,900,000. The jury also returned a verdict of liability against Touche Ross to Congregation on count III, a breach of contract theory, and assessed damages in the amount of $1,500,000. The circuit court thereafter entered a judgment order: (1) that granted Touche Ross' post-trial motion for an order of remittitur reducing the total judgment from $3,900,000 to $3,819,352; (2) that in all other respects, denied Touche Ross' post-trial motion; (3) that except as expressly provided, denied all post-trial motions of Congregation; (4) that entered judgment on the verdict of the jury on counts I and III finding Touche

Ross liable to Congregation for accounting malpractice/negligence and for breach of contract, respectively; and (5) that vacated the court's motion for remittitur as to count III in the amount of $1,500,000 since Congregation filed a statement refusing to consent to the proposed remittitur by the court.

On appeal, this court granted the parties' motions to cite additional authority and submit briefs in excess of the maximum page requirements; thus, the briefs are lengthy and the trial record is voluminous as well. Touche Ross has raised a multitude of issues on review. The alleged assignments of error are:

(1) Whether the circuit court erred in rejecting collateral estoppel arguments with respect to certain findings made by the Federal court in a prior action between the parties;

(2) Whether the circuit court erred in preventing Touche Ross' counsel from asking prospective jurors during *voir dire* about their religious affiliation and financial contributions to the Passionists or Catholic Church;

(3) Whether the circuit court erred: (a) in granting Congregation's motion *in limine* to exclude any reference to Congregation's other investment activities and (b) with respect to other rulings on several motions *in limine*;

(4) Whether the circuit court erred when it denied Touche Ross' motions for summary judgment, directed verdict and judgment notwithstanding the verdict on Congregation's negligence claim by refusing to find, pursuant to the *Moorman* doctrine, that Congregation is precluded from recovering purely economic losses in a tort action;

(5) Whether the circuit court erred when it denied Touche Ross' motions for directed verdict and judgment notwithstanding the verdict on the negligence count where Congregation abandoned its negligent misrepresentation allegations therein during the jury instruction conference and thereafter amended its complaint to delete all such allegations from the negligence count;

(6) Whether the circuit court improperly denied Touche Ross' motions for directed verdict and judgment notwithstanding the verdict by rejecting its argument that Congregation knowingly consented to Touche Ross' decision not to report Congregation's investments at their actual value;

(7) Whether the circuit court erred in refusing certain jury instructions proffered by Touche Ross, in particular, an instruction delineating the elements necessary to prove a claim based on negligent misrepresentation, which includes the element of reliance;

(8) Whether the circuit court committed error when it denied Touche Ross' motion for a new trial agreeing with the jury's finding that Congregation was 0% contributorily negligent;

(9) Whether the circuit court erred in denying Touche Ross' motion for a new trial when Congregation refused to consent to the court's remittitur of damages order;

CROSS-APPEAL

(10) Whether the circuit court erred in denying Congregation's claim for prejudgment interest;

(11) Whether the circuit court erred in directing a verdict against Congregation at the close of all of the evidence on its claim for breach of fiduciary duty; and

(12) Whether the jury's award of $1.5 million to Congregation on the breach of contract claim should be increased to $3,819,352, the amount stated and requested by Congregation as damages sustained.

BACKGROUND

The following facts are set forth from the record below. Touche Ross is an accounting firm that was organized as a co-partnership. Congregation is a Roman Catholic religious community consisting primarily of priests and brothers. It is organized as a not-for-profit corporation and serves as one of two provinces in the United States. Congregation maintains headquarters in Chicago, Illinois, and operates monasteries, retreat houses and schools in roughly the western two-thirds of the United States. Religious work is funded by outside contributions and income from capital the governing body (hereinafter the Provincial Council) has invested over the years.

Congregation hired investment specialists and advisors to manage its funds and portfolios. Prior to 1972 a Chicago-based accounting firm prepared the annual financial statements which included reports on the portfolios. In 1973 Congregation engaged the Chicago office of Touche Ross to perform and prepare a review of Congregation's financial statement for the year ending June 30, 1973. Beginning in 1973 and continuing each year through June 30, 1980, Touche Ross and Congregation entered into an agreement known as the "engagement letter" which delineated the services Touche Ross was to provide to Congregation. The engagement letter included a provision that Touche Ross was to "prepare unaudited financial statements for your use (Congregation's use) for the year ended June 30, 19--." The letter also stated that "[w]e wish to emphasize that our engagement is not for the purpose of expressing

an opinion on the financial statements and accordingly, the unaudited statements which we prepare will not satisfy any regulatory, contractual, or other requirements for an audit in accordance with generally accepted auditing standards. Furthermore, our engagement is not designed to disclose defalcations or other similar irregularities." The engagement letter provided Congregation with the responsibility "for the proper recording of transactions in the books of account *** and for the substantial accuracy of the financial statements."

With respect to the provision regarding investments, which primarily is the subject of this appeal, the engagement letter provided, in part:

> "Investments. Investment securities are to be physically inspected or confirmed by direct correspondence with independent custodians. Investment market values will be tested by reference to published market quotations. Interest due and dividends declared on investments held during the year will be agreed to reported receipts."

In July 1975 Congregation and Cranford Newell, an investment advisor, entered into an agreement authorizing Newell to manage certain funds for Congregation and granting Newell "full discretion" to manage the "Retirement Fund," which had an initial value of approximately $1 million. In early 1976 Congregation also established a "Permanent Fund" and committed an additional $1 million to Newell's management.

In 1976 Touche Ross began reviewing the new portfolio managed by Newell. The engagement partner, Phillip R. Melchert (hereinafter Melchert), who was responsible for Congregation's reports from 1974 onward, designated a manager and one or two junior employees who actually went through the accounts at Congregation's offices and prepared the workpaper notes and drafts. In 1976 one of the juniors assigned to Congregation's investment review was William Cornfield (hereinafter Cornfield) and the manager was Duane Oesterreich (hereinafter Oesterreich). In the year-end reviews, Touche Ross accountants worked closely with Brother James Kent (hereinafter Bro. Kent), Congregation's internal accountant and bookkeeper, and after Bro. Kent left the province, they worked with Sister Jeanette Flaherty (hereinafter Sr. Flaherty), Congregation's assistant treasurer/bookkeeper.

The Newell investment activity primarily involved "arbitrage"[1] transactions in "Governments,"[2] but also included some securities or

---

[1] The dictionary defines "arbitrage" as the purchase of securities on one market for immediate resale on another in order to profit from a price discrepancy.

[2] "Governments" are bonds issued by the Treasury or by Federal agencies.

bonds issued by corporations or municipalities. Newell's trading strategy involved highly leveraged arbitrage positions in Governments, and he established and maintained accounts with 10 or more government securities dealers, including Kidder Peabody & Co., The First Boston Corp., Bankers Trust Co., and Briggs, Schaedle & Co. Every dealer through whom Newell made a transaction, *i.e.*, opened, closed or repriced a position, sent confirmations relating to the transaction to Newell and directly to Congregation. It is not disputed that Newell also regularly sent a confirmation to Congregation which identified the securities purchased or sold, coupon value, face value, market value, accrued interest on the bond or note, if any, and other information.

According to the parties' briefs on appeal, problems commenced with the Newell reports when the question arose concerning the manner in which the Newell open arbitrage positions would be reported in Congregation's financial statements for the fiscal year ended June 30, 1976. According to Touche Ross' version of the facts, Bro. Kent advised it that he was having difficulty in determining the value of the arbitrage positions and that he was not recording the market value of these open positions on the internal records of Congregation. According to Congregation, Cornfield spoke to Bro. Kent and asked for an explanation of the transactions in the Governments' positions. When Newell began the arbitrage, Bro. Kent commenced recordation of the information received on the Newell confirmations on Congregation's spread sheets. The spread sheets included one figure which Newell denoted as "margin."[3] In any event, Cornfield and Oesterreich met with Father Parsons, Congregation's treasurer, and Bro. Kent to determine how to reflect the Newell open arbitrage positions in Congregation's financial statements.

Allegedly, Cornfield and Oesterreich told Congregation that they would discuss the matter with senior management at Touche Ross and come back with a recommendation. The two accountants prepared a workpaper note, which was uncovered during discovery proceedings,

---

[3]"Margin" is defined as the difference between the cost and the selling price of securities or commodities, *i.e.*, net cash paid.

"Market value" is defined as the amount that a seller may expect to obtain for merchandise, services, or securities in the open market.

The briefs also reflect that all Governments trade every day through hundreds of dealers. The market prices of this over-the-counter trading are reported daily in the *Wall Street Journal*, as well as other publications. Bonds and notes are quoted in market values of 1/32 of a point (*e.g.*, "Bid 97-24, Ask 97-28" means dealers stand ready to buy that issue at 97$24/32$% of par and will sell it at 97$28/32$% of par, par value is always $1,000).

but never delivered or shown to Bro. Kent or anyone else at Congregation. The note states:

"3) Arbitrage—when Newell determines that there is a temporary fluctuation in the price of a government security in relationship to other government securities he buys or sells short that security and purchase [sic] or sells short another government security at the same time. When the fluctuation is eliminated he reverses his previous purchase and short sale and takes a profit (or loss). These arbitrages are generally for over $1 million dollars [sic] and a small fluctuation (1/32 of 1%) can involve a substantial amount of money. The only money actually invested by the Congregation is for margin required by the dealers (typically the amount of the purchase less the amount of the short sale). The risk is minimized since only U.S. government securities are traded and the chance of default is small.

At June 30, 1976 the Congregation had open arbitrages aggregating $22.5 million at par value and short positions in the same amount. Since the trades in these securities involve minor fluctuations in price (1/32 or even 1/64 of a point) and there is no source which can tell us market value closer than 1 point ($222,500) it was decided not to gross up the balance sheet to reflect these items at market.

Instead footnote disclosure will be made of the total amounts involved and only the margin outstanding on these arbitrages will be included in investments.

W. Cornfield
10/4/76"

Thereafter, ostensibly following a discussion of the matter with Touche Ross, Bro. Kent and Sr. Flaherty, recorded and reported the Newell open arbitrage positions in Congregation's internal financial records at "margin" or net cash. Touche Ross reported the arbitrage investments on a cost basis and the resulting accounting method made Newell's investments appear profitable. Congregation asserts that this "decision" made by Touche Ross in the form of a recommendation to report the Newell investments in this manner formulates the essence of Touche Ross' negligence. Touche Ross contends that the "decision" was an agreement between it and Father Parsons determining that the market value of the Newell open arbitrage positions *would not* be reported in Congregation's financial statements; furthermore, Congregation did not provide it with any investment market values in 1976 or thereafter for those positions. Additionally, the figure that went into Touche Ross' annual report was the net margin as recorded in Congregation's records.

In the proceedings below and on appeal, it is Congregation's contention that any agreement or decision on how to report the open arbitrage positions did not relieve Touche Ross of any of the obligations that were set forth in the engagement letters in general, and in particular, as set forth in the "investments" paragraph therein. Congregation argues that Touche Ross was negligent for failure to inspect or confirm the securities or "test" the investment market values to published market quotations. On the other hand and conceding no liability, Touche Ross urges that Congregation knew of the realized losses in Newell's accounts because of several occurrences that transpired beginning in 1976, but did nothing to terminate Newell's contract, restrict his authority or warn Touche Ross.

Each year after 1976, Congregation maintained spread sheets which detailed the Newell information and then provided this information and a schedule based on the sheets to Touche Ross, which in turn totalled up the margins and reported that figure as "investments." The Touche Ross report for the fiscal year ended June 30, 1976 (and for fiscal years 1977, 1978 and 1979 thereafter) (hereinafter annual report), consisted of two sections: (1) the unaudited financial statements of Congregation that were reviewed by Touche Ross and (2) additional information. The Newell open arbitrage positions were included in the summary of investment activity schedule within the additional information section of the annual report. The conventional Newell investments were included at market value, while the open arbitrage positions were included at "margin." Touche Ross added a footnote to the financial statements, which was included in each annual report and disclosed that the open arbitrage positions were not reported at market value.

After Touche Ross completed work at Congregation's offices in 1976 and in subsequent years, Melchert met with members of the Provincial Council to discuss and review the contents of the annual report. The following chart shows the Newell activity as reported by Touche Ross in comparison with the actual market value:

| FISCAL YEAR | VALUE REPORTED BY TOUCHE ROSS | ACTUAL MARKET VALUE | UNREPORTED LOSSES ON FINANCIAL STMTS PREPARED BY TOUCHE ROSS |
|---|---|---|---|
| 1976 | 2,166,322 | 1,951,520 | 214,802 |
| 1977 | 1,795,346 | 1,471,720 | 323,626 |
| 1978 | 1,792,748 | 319,861 | 1,472,887 |
| 1979 | 2,226,014 | 878,638 | 1,347,376 |
| 1980 Draft | 3,706,190 | 1,286,410 | 2,419,780 |

According to Congregation, Touche Ross advised them that the Newell reports were substantially accurate; however, they misstated the actual market value of the open arbitrage positions from 1976 to 1980. Congregation alleges that after Mr. Witt, a Touche Ross employee who completed the 1980 field work, showed the value of Newell managed investments to be worth $3,700,000, Melchert came to Congregation's offices to conduct an investigation of his own. During the investigation, Melchert initiated his first contact with Newell in which he discussed the arbitrage situation. Subsequently, Melchert placed a conference call to the salesman for Kidder Peabody, the dealer with the largest Congregation positions, and learned that the market value of the securities in Kidder's custodianship as of June 10, 1980, had been just over $225,000. Melchert then informed Congregation that he was having problems with gathering information on the Newell investments; however, the final 1980 annual report was forthcoming.

Touche Ross asserts that Melchert raised a question concerning the assets in support of the $3.6 million year-end balance which Newell reported to Congregation and after numerous requests to both Congregation and Newell for additional information, Melchert was finally provided with the information he needed in January 1981. The information revealed that the market value of the Newell accounts as of June 30, 1980 was $1.2 million, or $2.4 million less than the investment value reported to Congregation by Newell. The information was confirmed in a conference call on February 4, 1981, which included Brother Kevin O'Malley (hereinafter Bro. O'Malley), who became Congregation's investment officer in late 1976 when Father Parsons divided the responsibilities of treasurer into two positions—the existing position of treasurer and the new position of investment officer; Melchert; and James Hart, a trader on the Chicago Board of Options Exchange and member of Congregation's business advisory board (hereinafter BAB).

Following several meetings and conferences with members of the Provincial Council, BAB and Touche Ross to discuss the arbitrage situation, during which time the equity in the Newell accounts had been depleted and substantial debts to certain dealers incurred, Congregation closed all Newell open position accounts with the four dealers. The dealers then made claims for account deficits aggregating more than $3,200,000.

THE FEDERAL LITIGATION

In June 1981 Congregation sued Newell and several government securities dealers alleging Federal securities law violations. The deal-

ers counterclaimed for amounts owed by Congregation after liquidation of the accounts. In May 1982 Congregation amended the Federal complaint to join Touche Ross as an additional defendant, and charged it with aiding and abetting the dealers' and Newell's securities law violations, breach of fiduciary duty and breach of contract. Following extensive discovery, in September 1984 the district court granted defendants' motions for summary judgment, finding that neither Newell nor the dealers had violated the securities law and that Touche Ross had not aided and abetted nonexistent securities law violations. The Federal court then dismissed the pendent common law State claims against Touche Ross for want of jurisdiction. *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.* (7th Cir. 1986), 800 F.2d 177, 179, 183-84.

### CIRCUIT COURT PROCEEDINGS

In 1984 Congregation filed a lawsuit against Touche Ross in the circuit court of Cook County that was comprised of three counts: professional malpractice/negligence, breach of fiduciary duty and breach of contract. The professional malpractice/negligence (hereinafter negligence) count alleged, *inter alia*, that the annual reports negligently reported the Newell investments on a basis other than market value, thus misleading Congregation by failing to disclose unrealized losses; that Touche Ross made negligent misrepresentations and omissions in its reports in the review of financial statements; and that Touche Ross made other oral and written misrepresentations.

Prior to trial, Touche Ross presented motions to dismiss the complaint and for summary judgment, contending that Congregation's overall claims were barred by collateral estoppel and that the negligence count was barred by the *Moorman* doctrine. The circuit court denied the motions; however, before the jury was selected the circuit court disposed of several motions *in limine* that were filed by both parties. The rulings included orders: that allowed Congregation to introduce evidence concerning Newell's bankruptcy and that Touche Ross was a large accounting firm with offices throughout the world; that foreclosed Touche Ross from presenting evidence about Congregation's other investments, from alluding in any way to the Federal court proceedings or in arguing the collateral estoppel effect of the Federal court findings.

Prior to *voir dire*, Touche Ross' counsel requested leave to ask the prospective jurors questions about their religious affiliation and financial contributions to the Passionists or the Catholic Church. How-

ever, the circuit court denied the request and severely restricted questions on the subject of religion.

At the close of all the evidence, during the conference on jury instructions, Touche Ross proffered an instruction concerning the elements necessary to prove a negligent misrepresentation claim. Touche Ross contends that when it proffered the instruction to the circuit court, Congregation's counsel replied that it was no longer alleging a claim based on negligent misrepresentation and then amended the complaint to delete all allegations of misrepresentation from the negligence count. The circuit court then refused Touche Ross' instruction and gave the jury an Illinois Pattern Jury Instruction (IPI) negligence instruction that did not require the plaintiff to prove the making of any misrepresentation or justifiable reliance. The circuit court instructed the jury separately on the negligence and contract counts and also directed a verdict against Congregation on its breach of fiduciary duty claim.

Congregation claimed compensatory damages for losses sustained after December 31, 1976, and its expert determined that there had been a net loss of funds invested with Newell of $1,439,574. The dealers' claims amounted to $3,293,350, for a subtotal of $4,732,924 lost or paid out. It was discovered that at some point full payment had been made on a single purchase involving $1,700,000 face amount of a long term bond issue held in the custody of Bankers Trust. When these bonds were sold, Bankers Trust deducted the deficit amount it was owed, and there remained $913,572 which was returned to Congregation. Thus, after subtracting the cash recovery from Banker's Trust, Congregation claimed compensatory damages in the amount of $3,819,352.

The jury returned separate verdicts for Congregation in the amount of $3.9 million on the negligence count and $1.5 million on the breach of contract count. On the negligence count, the jury found Congregation to be 0% contributorily negligent. When the circuit court instructed the clerk to enter judgment on the verdict, the clerk added the two amounts and recorded a judgment of $5.4 million. Following lengthy post-trial proceedings, the circuit court denied Touche Ross' motions for judgment notwithstanding the judgment and for a new trial and ordered remittitur to $0 on the breach of contract count and to $3,819,352 on the negligence count. Congregation agreed to remittitur on the negligence count, but refused consent to remittitur on the breach of contract count. The circuit court then entered a judgment of liability on both verdicts and a final judgment of $3,819,352.

As a threshold matter, Touche Ross contends that because the final monetary judgment was in the exact amount of the negligence verdict, as reduced by Congregation's consent to the remittitur, it appears as if the circuit court entered judgment on the breach of contract verdict on liability only. Although the jury assessed damages in the amount of $1.5 million on the breach of contract claim, yet no monetary judgment for breach of contract exists, Touche Ross argues that the scope of this appeal should be limited to negligence issues only.

Touche Ross has not cited any authority in support of this proposition. The record reflects that Congregation's complaint asserted allegations of fact based upon three theories of recovery. The circuit court directed a verdict against it on the breach of fiduciary claim, and gave instructions to the jury on the remaining two claims sounding in negligence and breach of contract. The jury found Touche Ross liable on both of the remaining theories since it returned separate verdicts and damage award amounts on the respective counts. However, the circuit court was required to enter an order of remittitur as a plaintiff is entitled only to recover actual losses, absent allegations and proof of additional damages, *i.e.*, punitive or special damages. Here, Congregation alleged actual damages in the amount of approximately $3.9 million and as a result it was not entitled to receive the purported combined jury award of $5.4 million. Accordingly, we agree with Touche Ross that because of the inconsistent verdicts, *i.e.*, $3.9 million on the negligence verdict and $1.5 million on the breach of contract verdict, it is incumbent upon this court to review the issues presented by both the negligence and breach of contract claims, as well as address the question of whether the assessed damage awards reflects confusion, prejudice or inconsistency on the part of the jury.

## I. COLLATERAL ESTOPPEL

Touche Ross asserts that the circuit court erroneously refused to give collateral estoppel effect to findings of the Federal courts made in a prior action involving the parties here and security dealers and that such errors allowed Congregation to advance contentions in the circuit court which were contradictory to and "necessarily inconsistent" with findings of fact made on identical issues by the Federal courts. (*Wozniak v. County of Du Page* (7th Cir. 1988), 845 F.2d 677, 682-83; *Buttitta v. Newell* (1988), 176 Ill. App. 3d 880, 882-84, 531 N.E.2d 957, 959-60.) It contends that in the Federal litigation, the district court and the court of appeals determined that Newell was Congregation's agent; Newell acted within the scope of his authority;

Congregation relied on Newell and BAB in making its investment decisions; Congregation was able to track the investments; Congregation and Touche Ross agreed to report the investments on a cost basis; and Congregation, itself, was responsible for, and the proximate cause of, the losses incurred. Thus, the Federal courts concluded that: (1) the dealers did not commit primary violations of the Federal securities laws; (2) Newell did not commit a primary violation of the Federal securities laws; (3) Congregation was liable on the counterclaims of the dealers since Newell had discretion to act as its agent in executing the arbitrage transactions and Congregation was aware of each transaction; and (4) Congregation was responsible for the deficits created when the investments lost money since it was fully aware of the transactions and the type of risks involved.

In support of its argument, Touche Ross refers to the case of *Buttita*, where this court held that the findings made in a prior action barred the plaintiff from later establishing that the defendant's negligence caused his losses. In the first action, plaintiff was found to have knowingly violated the Interest Act. Plaintiff then sued defendant, his attorney, alleging negligent advisement; however, the court determined that the earlier finding barred the plaintiff's claim alleging defendant's negligence as the cause of damages incurred. (*Buttita*, 176 Ill. App. 3d at 884.) Thus, Touche Ross contends that the findings of the Federal courts, if given collateral estoppel effect, preclude Congregation from arguing that Touche Ross' alleged negligence and breach of contract caused the investment losses since the Federal courts determined that Congregation and its own agent were the cause of the losses incurred.

Congregation contends that Touche Ross' collateral estoppel arguments were correctly rejected at different stages in the proceedings before the circuit court by three different judges, all of whom determined that the issues relevant to the instant action were never fully and fairly litigated in the prior Federal case. Specifically, Congregation urges that the decision in the Federal case was limited to the securities fraud action against the dealers with whom Newell made the investments in Governments, rather than Congregation's pendant State law claims against Touche Ross.

Collateral estoppel (issue preclusion) applies when a party "takes part in two separate, consecutive cases arising from different causes of action and some fact controlling, or question material to, the determination of both cases has been adjudicated against that party in the prior case." (*Buttitta*, 176 Ill. App. 3d at 882.) The relevant considerations for the application of collateral estoppel are: (1) whether the is-

sue decided in the prior adjudication is identical with the one presented in the case in question; (2) whether there has been a final judgment on the merits in the prior case; and (3) whether the party against whom estoppel is asserted is a party or in privity with a party to the prior adjudication. *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 113, 499 N.E.2d 1373, 1375.

In the instant case, although the requirements for the third element are present, the other two elements do not appear of record sufficiently necessary to invoke the doctrine of collateral estoppel. First, the exact issue before the circuit court was not fully litigated in the prior Federal action. (*Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill. App. 3d 782, 785, 455 N.E.2d 811, 815.) Our supreme court has determined that the party against whom estoppel is asserted must have had a full opportunity to litigate the issue or question (*Illinois State Chamber of Commerce v. Pollution Control Board* (1979), 78 Ill. 2d 1, 7, 398 N.E.2d 9, 12), contrary to the situation here, where the first time a trier of fact ever considered evidence on the issues of proximate cause and knowledge or other factors pertaining to Touche Ross' purported negligence and breach of contract was at the trial below. Such considerations were not made in the Federal court proceeding where the court there dismissed Congregation's pendent State claims against Touche Ross. Although the findings of fact concerning the Federal securities law violations could overlap and suggest possible conclusionary determinations with respect to the State pendent claims, in the final analysis and in light of the Federal court's lack of jurisdiction, the latter claims are proper matters to be decided by the trier of fact in the State court.

Second, no determination on the merits of the pendent State claims was ever sought by Touche Ross in the Federal case, and none was ever made by the Federal court. Moreover, dismissal of a claim for lack of subject matter jurisdiction does not constitute a final decision on the merits (*Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 113, 251 N.E.2d 242, 247) and thus should not serve as the basis for collateral estoppel. See *Telegraph Savings & Loan Association v. Schilling* (1984), 105 Ill. 2d 166; *Suslick v. Rothschild Securities Corp.* (1987), 164 Ill. App. 3d 589, 517 N.E.2d 600.

Accordingly, we affirm the circuit court's decision rejecting Touche Ross' collateral estoppel argument with respect to findings made in the Federal proceedings brought by Congregation against securities dealers and Touche Ross.

## II. *VOIR DIRE*

Touche Ross asserts that the circuit court committed reversible error when it limited the scope of *voir dire* examination regarding potential jurors' religious affiliations, contributions and attitudes. Prior to *voir dire*, Touche Ross proffered a number of questions to the circuit court to ask of potential jurors, including, in relevant part:

"(1) The plaintiff in this case is an order of priests and brothers of the Roman Catholic Church, the Passionist Fathers. Is anyone here a member of the Roman Catholic Church? Is there anyone here who once was a member of the Roman Catholic Church but no longer is?

(2) Is there anyone here who has made a financial contribution to the Roman Catholic Church or to any order or institution of the Roman Catholic Church including hospitals, monasteries or schools?

(3) Have you or any member of your family ever made a financial contribution to the Passionist Fathers?"

The circuit court refused to ask any of the above questions and prohibited defense council from asking them.

Touche Ross contends that because Congregation is an order of the Catholic Church and because part of the investment funds it lost came from private charitable contributions, the proffered questions were appropriate to uncover any latent bias or prejudice on the part of jurors that could affect their consideration of the evidence. Relying on decisions from other jurisdictions, Touche Ross urges that a party is entitled to discover the religious affiliations of potential jurors in cases where a religious organization is involved. *Hornsby v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints* (Utah App. 1988), 758 P.2d 929, 931-33; *Casey v. Roman Catholic Archbishop* (1958), 217 Md. 595, 604-07, 143 A.2d 627, 630-32.

Congregation counters that none of the decisions relied upon by Touche Ross arose in Illinois. They urge that the circuit court properly followed the law of Illinois as applied to *voir dire* questioning.

The responsibility for *voir dire* examination lies with the trial judge, and the scope and extent of this examination rests within his or her discretion. (107 Ill. 2d R. 234; *Kingston v. Turner* (1987), 115 Ill. 2d 445, 465, 505 N.E.2d 320, 329.) The exercise of the trial judge's discretion will not be disturbed on appeal unless the record as a whole illustrates that the judge's conduct impaired the selection of a fair and impartial jury. (*People v. Teague* (1983), 108 Ill. App. 3d 891, 894, 439 N.E.2d 1066, 1069.) The standard of review for abuse of dis-

cretion is whether the inquiry permitted created a reasonable assurance that prejudice would be discovered if present. *Friedman v. Park District of Highland Park* (1986), 151 Ill. App. 3d 374, 382, 502 N.E.2d 826, 832.

█ In the case at bar, the transcript of the *voir dire* shows that the circuit court gave counsel permission to ask prospective jurors, *inter alia* (1) whether anyone was a member of a religious order; (2) whether a juror or any member of his family had ever been employed by any church, church-related association, including hospitals and schools; (3) whether a juror or any member of his family had ever been a member of a religious organization; (4) whether there was anyone present who would give greater weight to the sworn testimony of a member of a religious order than he would a layperson; and (5) whether it would trouble anyone if the attorney cross-examined a witness who was a member of a religious order.

Thus, in exercising its discretion, the circuit court employed means to test prospective juror impartiality, which created a reasonable assurance that prejudice would be discovered if present. (See *People v. Bunch* (1987), 159 Ill. App. 3d 494, 512 N.E.2d 748.) Unlike in *People v. Dallas* (1980), 85 Ill. App. 3d 153, 405 N.E.2d 1202, which involved nuns, the trial court below asked prospective jurors whether they would give greater credibility to the testimony of religious persons simply because of their status. (See also *United States v. Daily* (7th Cir. 1944), 139 F.2d 7 (where the Federal court allowed inquiry as to the prejudice of prospective jurors because defendant was a Jehovah's Witness, but did not allow inquiry as to the religious beliefs of the venire).) Here, the circuit court did not preclude either side from asking questions about membership in any religious organization, membership in a religious order, or employment by any religiously affiliated institution and also gave counsel an opportunity to ask about the weight a juror would give to the testimony of priests, brothers or nuns and whether cross-examination of such religious persons would be troubling. Even in a criminal case, all that is required of the trial judge is a standard inquiry into whether sympathy, bias, or prejudice would affect a potential juror's judgment or prevent him or her from being impartial. (*People v. Bunch*, 159 Ill. App. 3d at 510.) Here, Touche Ross does not point out or claim any specific prejudice on the part of the jury. Additionally, Congregation contends that Touche Ross had three unexercised peremptory challenges at the close of the *voir dire*.

Accordingly, we conclude that the circuit court did not abuse its discretion in denying Touche Ross' specific supplemental questions

submitted for *voir dire* where the court-conducted and counsel-conducted examination of the venire afforded ample opportunity to discover any concealed bias or prejudice. In fact, when it was disclosed that one of the veniremen was employed by the Archdiocese of Chicago as a schoolteacher and another was a minister of the United Church of Christ, the trial court permitted counsel latitude to discover any partiality on their part, listened to counsel's respective arguments and finally excused the first venireman for cause while counsel excused the second venireman by exercising a preemptory challenge. We affirm on this issue.

### III. MOTIONS *IN LIMINE*

Prior to trial, Congregation made a motion *in limine* to exclude any reference to "the nature of or any problem relating to" its investments other than the accounts managed by Newell and over the objections of Touche Ross, the circuit court granted this motion. Touche Ross argues that this ruling hampered its efforts: to establish the speculative nature of Congregation's overall investment philosophy, to rebut Congregation's damage theory, and to establish an affirmative defense of contributory negligence. Touche Ross states that Congregation's theory professed if Touche Ross had reported the market value of the Newell open arbitrage positions, the unrealized losses would have been discovered as early as 1976 and Congregation would have terminated its relationship with Newell. Thus, Touche Ross urges that Congregation's investment strategy and its conduct in response to losses incurred in other investment accounts were relevant and central to the defense of this action.

Touche Ross postulates that evidence regarding Congregation's other investments would have shown that Congregation's financial officers, particularly the treasurer and investment officer, were habitual risk takers uninterested in conservative investments. They also maintain that the nature of Congregation's other investments was directly relevant to show how those investments and the Newell investments were reflected in the financial statements and that some of Congregation's other investments were not carried at market. Additionally, the circuit court's redaction of documents resulted in the presentation of documents to the jury in a grossly distorted form.

Alternatively, Touche Ross contends that the circuit court's order regarding redaction of Congregation's investments violated a well-settled evidentiary principle which requires the complete presentation of evidence. (See Fed. R. Evid. 106.) Relying upon *Pridmore v. Whiting Corp.* (1932), 268 Ill. App. 592, 605, wherein the appellate court de-

termined the circuit court committed reversible error in allowing plaintiff to offer only portions of an audit report and omit explanatory comments and certain other exhibits (see also *Yassin v. Certified Grocers of Illinois, Inc.* (1986), 150 Ill. App. 3d 1052, 1072, 502 N.E.2d 315, 330-31), Touche Ross argues that the year-end financial statements, schedules and work papers should have been admitted in their entirety.

Touche Ross also contends that the circuit court compounded the error by inconsistently applying the *in limine* order throughout the trial. For instance, although Congregation's witnesses were allowed to discuss other investments and thus opened the door on cross-examination to this line of questioning, the circuit court refused to permit Touche Ross to entertain such an inquiry relying upon the *in limine* ruling as the basis for the refusal.

Congregation asserts that the circuit court properly excluded references to other investments, which are not relevant here to contributory negligence or any other issue. Moreover, they argue that the circuit court's ruling did not materially preclude reference to other investments or prevent Touche Ross from showing the jury, if it could, that other investment securities, which had market value, were reported at cost or at something other than market value. Congregation maintains that the order merely prevented the introduction of irrelevant and confusing evidence about the nature of securities managed by other investment advisors, none of which were the subject of any claims made by Congregation against Touche Ross.

The test of an *in limine* ruling on appeal is whether the circuit court abused its discretion by excluding or allowing the evidence, and if so, whether the party suffers unfair prejudice or the exclusion or admission of the evidence materially affected the outcome of the case. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 414, 416 N.E.2d 1232, 1237.) The decision whether or not to grant a motion *in limine* is squarely within the discretion of the circuit court (*Terracina v. Castelli* (1979), 80 Ill. App. 3d 475, 400 N.E.2d 27), and in exercising this discretion, the circuit court should balance the prejudice that might be avoided if it grants the motion against the complication or inconvenience that would result if the motion is denied. *Kerns v. Lenox Machine Co.* (1979), 74 Ill. App. 3d 194, 392 N.E.2d 688.

■ Because there is no error in excluding testimony which does not bear on the specific issues under consideration (*Eleopoulos v. Dzakovich* (1981), 94 Ill. App. 3d 595, 418 N.E.2d 980) and the circuit court's decision will not be reversed absent an abuse of discretion (*Behrstock v. Ace Hose & Rubber Co.* (1986), 147 Ill. App. 3d 76, 496

N.E.2d 1024), we affirm the circuit court's decision allowing Congregation's motion to exclude references "relating to investments which were not the subject of this lawsuit." First, the prevention of jury confusion, as pointed out in Congregation's brief, is recognized as a proper basis for excluding evidence which is arguably relevant. (*Fullerton v. Robson* (1978), 61 Ill. App. 3d 93, 96, 377 N.E.2d 1044, 1048.) Second, there appears to be no violation of the rule of "completeness" here. Although a party is entitled to present evidence that is relevant to its theory of the case and also to introduce evidence "which tends to show conduct inconsistent with an opponent's theory" (*Vendo Co. v. Stoner* (1982), 108 Ill. App. 3d 51, 55, 438 N.E.2d 933, 936), it does not appear that Touche Ross has met the relevancy test here. The fact that Congregation may have had problems with other investment advisors has no relevance and is not material to its claims that Touche Ross negligently failed to properly value the Newell investments.

■ With respect to other motions *in limine*, Touche Ross asserts that the circuit court erroneously permitted Congregation to refer to Touche Ross as a large international accounting firm and precluded Touche Ross from introducing the Federal court complaint into the proceedings. As we have already addressed the issue with respect to the findings of fact in the Federal court proceedings, we will only address the remaining *in limine* ruling with respect to the circuit court's order allowing Congregation to refer to Touche Ross as a large firm.

Touche Ross asserts that such evidence was irrelevant to any issue in this litigation. In addition, it was highly prejudicial where Congregation repeatedly emphasized to the jury that "Touche Ross had financial specialists and consultants in every major capital in the western world." *People v. Groleau* (1987), 156 Ill. App. 3d 742, 748, 509 N.E.2d 1337, 1341.

Congregation responds that the ruling was proper in that information respecting the size and reputation of the firm is relevant to this case as Congregation hired and relied in part upon Touche Ross because of its size and sophistication. Also, mere emphasis on a party's corporate nature has been found not to constitute reversible error if it appears that no actual prejudice resulted. *Ruffiner v. Material Service Corp.* (1985), 134 Ill. App. 3d 747, 759, 480 N.E.2d 1157, 1165.

With regard to the motion "to exclude evidence of Touche Ross as a 'Big 8' accounting firm," Touche Ross has not shown that it was unfairly prejudiced by the testimony with regard to the size of the firm or the location of its offices or that the evidence materially affected

the outcome of the case. The issue is whether error occurred which prejudiced the appellant or unduly affected the outcome of the proceedings. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132, 139, 254 N.E.2d 453.) We do not believe that the references at issue here rose to the level of reversible error. Such evidence did not tend to evoke any bias a jury might be inclined to show against corporations generally because both parties involved were large, well-off corporate entities. The evidence does not concern the wealth of a party; nor is this a situation where a little person or victim is alleging harm on the part of a multimega corporation. Additionally, the jury was made well aware of the identities of the parties. Accordingly, we affirm the circuit court's ruling.

### IV. APPLICATION OF *MOORMAN*

Touche Ross asserts that as there were written contracts governing the obligations of the parties for each fiscal year, it was entitled to a directed verdict on Congregation's negligence claim because it is well established that a plaintiff cannot recover in tort for purely economic losses when a written contract establishes the rights and duties of the parties. (*Album Graphics, Inc. v. Beatrice Foods Co.* (1980), 87 Ill. App. 3d 338, 408 N.E.2d 1041.) Touche Ross argues that when the parties are in privity of contract, as here, the law of contract, and not tort theory, governs actions for purely economic losses and since Congregation's negligence count was simply an assertion that Touche Ross negligently breached its contracts, such claim is barred by *Album Graphics*.

Moreover, Touche Ross continues that the Illinois Supreme Court also has recognized the fundamental difference between rules relating to recovery of economic losses in contract and tort in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443. Touche Ross contends that the *Moorman* holding stands for the proposition that economic losses are not recoverable in tort. Moreover, the *Moorman* holding was expanded to include professional services in *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 503 N.E.2d 246, wherein Justice Simon, in a concurring opinion, stated that to permit a party to a service contract to proceed in tort could impose obligations on a defendant going far beyond those bargained for in the contract and could subject the defendant "to a higher standard of care" and perhaps to "greater potential liability" than it intended to undertake when entering the contract. (115 Ill. 2d at 156 (Simon, J., concurring).) Touche Ross maintains that Justice Simon's concerns were borne out here, where the jury re-

turned two inconsistent verdicts. Because the decisional law in Illinois prevents Congregation from proceeding in tort, Touche Ross urges that it was entitled to summary judgment, directed verdict, or judgment notwithstanding the verdict on the negligence claim.

Congregation asserts that the "economic loss" doctrine has never applied to prevent tort recovery from one who is in the business of supplying information for the guidance of others in their business transactions. Congregation maintains Touche Ross fails to mention the *Moorman* exception which provides that economic loss is recoverable when one who is in the business of supplying information for the guidance of others in their business transactions makes negligent misrepresentations. (*Moorman*, 91 Ill. 2d at 88-89.) Congregation contends that the exception applies squarely to accountants with respect to negligent misrepresentations comprising the information they furnish a client to be used in the client's business transactions. For example, the *Rozny* rule (*Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656) states that purchasers of residential housing can recover against a surveyor for negligently inaccurate representations of the survey. Like *Rozny*, where the only use of the survey information was to furnish guidance to persons related to their business decisions, here public accountants supply nothing but information to their clients.

■ With respect to the *Moorman* argument, to date, our supreme court has not squarely decided the issue before this court. Although Touche Ross argues *Anderson* signals that the doctrine of economic loss is applicable to professional malpractice actions, Congregation rejoins that *Anderson* fails to discuss the professional liability exception as enunciated in *Moorman* and discussed in other cases. Additionally, *Rosos Litho Supply Corp. v. Hansen* (1984), 123 Ill. App. 3d 290, 462 N.E.2d 566, decided two years before *Anderson* and involving malpractice by an architect, is not mentioned in *Anderson*. In *Rosos*, this court refused to apply *Moorman*, stating that to do so would abolish by inference all professional malpractice actions charging economic loss, arising from service contracts, based upon negligent violation of professional standards of care and skills. However, more recently, our Illinois Supreme Court affirmed the appellate court's holding that Illinois law precludes the recovery of economic losses in tort cases, including legal malpractice, which are based on claims of negligence. (*Collins v. Reynard* (October 31, 1991), No. 70325.) Although the court there refused to carve out an exception to *Moorman* and its progeny for attorney malpractice for recovery of purely economic losses under a tort theory of negligence unless the attorney malpractice action fit into one of the enunciated narrow ex-

ceptions, *i.e.*, where the attorney-defendant owed some extracontractual duty to the injured party or where the role of the defendant was that of a guarantor to the plaintiff, the court did reaffirm that "economic losses were to be recoverable (1) when one *intentionally* makes *false representations*, or (2) when one who is in the business of supplying information for the guidance of others in their business transactions makes *negligent misrepresentations*." (Emphasis added.) (*Collins*, slip op. at 3, citing *Moorman*, 91 Ill. 2d at 88-89.) Because Congregation alleged that Touche Ross made negligent misrepresentations, the second exception to *Moorman* would apply if the other elements were found to be present. Congregation exercised its right to pursue all possible theories of recovery based on a single core of operative facts in a single proceeding (*Stolzenbach v. Pagoria* (1979), 71 Ill. App. 3d 863, 866, 390 N.E.2d 376, 378), and thus the trial court properly found it had a right of action for negligent misrepresentation in negligence or on the contract under which the information was supplied. (Restatement (Second) of Torts §552, Comment *g* (1977).) We believe that the trial court properly instructed the jury under each theory, contract and tort, since both theories were pleaded by Congregation and there was evidence in the record supporting each theory. Furthermore, although all malpractice by an accountant rests in some degree on a violation of the parties' contract, the courts most frequently hold accountants liable to their clients in tort (Annot., *Accountant's Malpractice Liability to Client*, 92 A.L.R.3d 396 (1979)), and as previously stated, case law firmly establishes that the *Moorman* doctrine does extend to professionals and to professional malpractice/negligence actions under the proper factual circumstances.

   ■ Touche Ross also argues that it cannot be found negligent since it followed the rules of the accounting profession and violated no binding standards. Congregation's own experts agreed with Touche Ross' accounting expert that no authoritative opinion or statement requires debt securities to be recorded at market value on the financial statements. Touche Ross contends, then, that the mutual decision by the parties to report the Newell open arbitrage positions at net cash was appropriate; thus, Touche Ross was entitled to a directed verdict on the negligence count because the jury verdict rendered holds them to a higher standard than that recognized in the profession as a whole.

   Congregation rejoins that it proved the standard of care required of professional accountants through expert testimony, and such standard is recognized as a very high level of professional responsibility. (*Margolies v. Landy & Rothbaum* (1985), 136 Ill. App. 3d 635, 638,

483 N.E.2d 626, 629.) Here, they argue, the evidence shows that Touche Ross negligently misrepresented that it was reporting the Governments at market and presented inaccurate financial statements although the basic objectives of financial statements is to provide information to the clients useful for making economic decisions. Further, there was ample testimony that Touche Ross had violated generally accepted accounting principles. The law of negligent misrepresentation involves a breach of the duty to use due care in obtaining and communicating information upon which others may reasonably be expected to rely in the conduct of their economic affairs. (*United States v. Neustadt* (1961), 366 U.S. 696, 6 L. Ed. 2d 614, 81 S. Ct. 1294.) A misrepresentation can result from the failure to provide adequate information when there is a duty to provide such information as well as providing information which is false. (*Leaf v. United States* (9th Cir. 1981), 661 F.2d 740, 742.) A negligent misrepresentation is a representation that the maker believes to be true, but because of negligent expression, is in fact false. *Luciani v. Bestor* (1982), 106 Ill. App. 3d 878, 888, 436 N.E.2d 251.

With respect to the parties' arguments about the several issues applicable to a negligence action against an accountant and the sufficiency of the evidence in the present case, our courts have found that the question of proximate causation in accounting malpractice actions, as in all negligence actions, is a question for the jury to be determined from all the attendant circumstances. (*First National Bank v. Brumleve & Dabbs* (1981), 183 Ill. App. 3d 987, 992, 539 N.E.2d 877, 880.) Here, a review of the record shows that the evidence heard by the jury supported its verdict against Touche Ross. The language in the "investments" paragraph which required Touche Ross to inspect and confirm securities was presented to the jury in addition to the disclaimers found in the footnotes to the financial statement. Further, the record shows that Melchert admitted "major errors" in the reports. Accordingly, upon reconciliation of the *Moorman* issue, we find that the record supports the jury's verdict on the negligence count.

### V. JURY INSTRUCTION ON NEGLIGENT MISREPRESENTATION

In the alternative, Touche Ross urges that the circuit court committed reversible error by denying motions for a directed verdict and judgment *n.o.v.* on the negligence count when Congregation, after the close of all the evidence, abandoned the claim that Touche Ross had made "negligent misrepresentations and omissions in its Reports on Review of the Financial Statements." It asserts that Congregation amended the complaint to delete any reference to negligent misrepre-

sentation because it had failed to prove at trial that Congregation relied upon alleged misstatements of the market value of the arbitrage positions in the reported and financial statements.

Congregation counters that it did not abandon the negligence claim, but merely amended the complaint to conform the allegations to the evidence. (*Gordon v. Bauer* (1988), 177 Ill. App. 3d 1073, 532 N.E.2d 855.) It asserts that counsel merely responded to the nature of the negligence claim when Touche Ross asked the court for jury instructions that in order to prevail, Congregation had to prove Touche Ross *intended* that its misstatements would be relied upon by the Congregation.

■ We have reviewed the record and found that the original negligence count against Touche Ross contained allegations for negligent misrepresentation and these allegations were realleged in all material aspects in the amended complaint. Congregation contended and the court accepted the proposition that additional allegations of negligent misrepresentations should be added and certain repetitive allegations deleted to avoid confusion when read to the jury in the issue instruction. Because the circuit court required the issue instruction to contain, verbatim, the claims and affirmative defenses as pled by each party, both parties filed amended pleadings during the issues conference. Accordingly, as we believe that the amended complaint properly contained all material allegations of negligent misrepresentation and in any event, vague, unintentional, oral statements of counsel will not operate as a waiver of the allegations contained in the pleadings (see *Melrose Park National Bank v. Melrose Park National Bank* (1984), 123 Ill. App. 3d 282, 462 N.E.2d 741), we affirm the circuit court's denial of Touche Ross' motions for directed verdict and judgment notwithstanding the verdict on this question. Moreover, "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs." Ill. Rev. Stat. 1989, ch. 110, par. 2—616(c).

### VI. CONGREGATION'S KNOWLEDGE AND CONSENT

Touche Ross argues that the manifest weight of the evidence establishes that Congregation consented to the accounting method used to report the Newell open arbitrage positions because both Father Parsons and Bro. Kent testified to a meeting with two accountants from Touche Ross in which the parties agreed that the Newell investments would be reported at margin or net cash and the financial statements are entirely consistent with this agreement. Further, Touche Ross only agreed to prepare unaudited financial statements, of

which the summary of investment activity schedule was not a part, and Sr. Flaherty knew the schedules did not contain market value figures because she herself gave them to Touche Ross each year to be included in the annual report as additional information with the instruction not to report the open positions at market value.

Touche Ross next asserts that even if the investment paragraph of the engagement letter had been applicable here, Congregation waived application of that provision by agreeing with it that the open arbitrage positions would not be reported at market value and when it did not question the manner in which the investments were reflected in the financial statements although that reporting method was clearly disclosed in a footnote to the financial statements. Touche Ross also raises the argument that Congregation was estopped from alleging that the open arbitrage positions should have been reported at market.

Congregation contends that the jury properly rejected the defenses of consent and waiver and that there was no basis for estoppel here. It argues that to prevail on any of these theories, Touche Ross must have established that Congregation intentionally and knowingly agreed that the value of the Newell investments would be reported at meaningless values, rather than at their actual or market value, despite the annual promises in the engagement letters to do the opposite. Contrary to Touche Ross' assertions, neither Father Parsons nor Bro. Kent ever agreed that the value of the investments would be reported at anything other than their real (or market) value. It claims that both men testified that Touche Ross recommended a method of accounting and that Melchert always believed that cost was substantially equal to market and repeatedly advised the Provincial Council members of this belief.

In *Sexton v. Smith* (1986), 112 Ill. 2d 187, 193, 492 N.E.2d 1284, the Illinois Supreme Court defined the doctrine of waiver as the "intentional relinquishment of a known right." In the present case, Touche Ross was allowed to fully present evidence on its defenses and the circuit court properly instructed the jury that if it believed that Touche Ross had proved the defenses, its verdict should be for Touche Ross. Further, there was conflicting evidence whether the contract had been performed according to its terms and whether the conduct of Congregation constituted a waiver of a known right delineated in the contract.

■ Accordingly, we find that evidence of the applicability of the investment paragraph contained in the engagement letter contract and discussions between Congregation officers and Touche Ross em-

ployees and its managing partner concerning the Newell arbitrage investments presented a jury issue as to whether Touche Ross was at fault when it not only failed to report the investments at margin or net cash, but also when it failed to physically inspect, confirm or test the market value of the investments by reference to published market quotes as required by the engagement letter contract prior to each year-end report. Moreover, conflicting evidence as to whether Congregation accepted the information contained in the reports by agreeing to report the Newell arbitrage investments in a particular manner was a jury question. Additionally, conflicting evidence as to whether Congregation had knowledge that such information and reporting reflected a value of the investments less than their real or market value, coupled with knowledge that such conduct by Touche Ross constituted a breach of the engagement letter contract so as to waive such breach, was also a question for the jury. The resolution of those issues rests on the credibility of the witnesses, and the jury, as the trier of fact, was in the best position to weigh the evidence and observe and assess the credibility of the witnesses. As findings of fact by the jury will not be disturbed unless contrary to the manifest weight of the evidence (see *Hartwig Transit, Inc. v. Menolascino* (1983), 113 Ill. App. 3d 165, 446 N.E.2d 1193), we decline to reverse the trial court's denial of Touche Ross' motions for directed verdict and judgment notwithstanding the verdict.

## VII. OTHER JURY INSTRUCTIONS

■ Touche Ross also contends that the circuit court committed prejudicial error by refusing jury instructions tendered by it, including, but not limited to, instructions concerning the scope of an agent's authority; explaining that an agent's knowledge is imputed to his principal; setting forth the elements of a cause of action based upon negligent misrepresentation; relating to the elements necessary to establish a breach of contract claim; explaining that a written agreement may be modified by a subsequent oral agreement; concerning the doctrine of waiver; explaining the doctrine of equitable estoppel; and relating to the findings of fact made by the Federal courts.

We have reviewed the relevant portions of the record and the parties' arguments made at the issues and instructions conference and conclude that the jury was correctly instructed for purposes of this trial and further any error that may have occurred in disallowing Touche Ross' proffered instructions did not constitute reversible error. Where no prejudice is shown, our courts have held that refusal to give an instruction is not reversible error. (*Goodrick v. Bassick Co.* (1978),

58 Ill. App. 3d 447, 453-54, 374 N.E.2d 1262.) A review of the court's decision to disallow certain instructions shows that the instruction was rejected either because no proof had been offered at trial with respect to the giving of such instruction; because it would have been misleading to the jury; because it was an inaccurate statement of the law; because it was argumentative; because it did not follow the applicable IPI rules; or because other instructions adequately covered a given subject.

### VIII. CONTRIBUTORY NEGLIGENCE

██ With respect to alleged erroneous post-trial rulings made by the circuit court, Touche Ross first asserts that the circuit court should have granted a new trial on Congregation's negligence count because the manifest weight of the evidence establishes that Congregation was contributorily negligent by making improvident investment decisions. It asserts that Congregation failed to properly monitor Newell's activities, gave him unbridled discretion, and allowed him to continue to engage in arbitrage trading even after learning that the market value of his account was substantially less than he had represented. It contends that, minimally, the jury should not have found Touche Ross liable for the additional $500,000 Congregation invested with Newell on April 14, 1981, after learning of the losses already incurred and further that the amount of damages incurred by Congregation at that time was under $1 million.

The question of contributory negligence is a question of fact for the jury and its determination here must stand unless all of the evidence, when viewed in a light most favorable to Congregation, overwhelmingly favors this defendant so that no contrary verdict based on this evidence could ever stand. *Gruidl v. Schell* (1988), 166 Ill. App. 3d 276, 281, 519 N.E.2d 963.

### IX. REFUSAL TO CONSENT TO REMITTITUR OF DAMAGES

Touche Ross contends that a remittitur reducing a jury verdict is appropriate when the circuit court concludes, as it did here, that the damages awarded by the jury are excessive and that they do not conform to the evidence adduced at trial. (*Wall v. Amoco Oil Co.* (1981), 92 Ill. App. 3d 921, 925, 416 N.E.2d 705, 708-09.) It asserts however, as here, after the circuit court orders a remittitur and the plaintiff fails to consent to such order, defendant is entitled to a new trial. (*Prochot v. Drew* (7th Cir. 1960), 283 F.2d 904, 905.) However, Touche Ross says that the intent of the jury cannot be ascertained here as shown by the inconsistent verdicts and award of damages. Moreover,

the judgment of the circuit court is also inconsistent where the order entered a liability, but no money judgment on the contract verdict.

Congregation distinguishes the cases cited by Touche Ross and contends that none of them support a request for a new trial. It asserts that the judgment here, as remitted by the circuit court, is supported by the evidence and any inconsistency between the jury's awards on the counts involves the amounts only. Congregation contends that the judgment order entered below correctly reflects the jury's award of the full measure of damages to it. The judgment provides:

> "ORDERED that judgment is entered on the verdict of the jury on Counts I and III finding the defendant *** liable to plaintiff for accounting malpractice-negligence (Count I) and breach of contract (Count III).
>
> * * *
>
> *JUDGMENT*
>
> IT IS ORDERED that plaintiff *** have final judgment against and recovery against defendant *** in the principal amount of $3,819,352.00, plus interest *** and taxable costs of $3,858.67."

If, after considering all the evidence, the trial judge concludes that the jury verdict is excessive, the judge may allow the verdict to stand but must act to correct the injustice; and the failure to do so is itself error. (*Hedrich v. Borden Co.* (1968), 100 Ill. App. 2d 237, 241 N.E.2d 546.) The trial court can rectify an excessive award by ordering a remittitur, which is an agreement by the plaintiff to relinquish, or remit to the defendant, that portion of the jury's verdict which constitutes excessive damages (*Anderson v. Greyhound Lines, Inc.* (1975), 34 Ill. App. 3d 643, 339 N.E.2d 465), and to accept the sum which has been judicially determined to be properly recoverable damages. *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 540 N.E.2d 770.

It is established in Illinois, however, that the trial court does not have the authority to reduce the damages by entry of a remittitur if the plaintiff objects or does not consent. (See *Foster v. Springfield Clinic* (1980), 88 Ill. App. 3d 459, 410 N.E.2d 604.) Additionally, it is well settled that a plaintiff's refusal to consent to remittitur will result in the trial court ordering a new trial. (See *McCausland v. Wonderly* (1870), 56 Ill. 411; *National Malleable Castings Co. v. Iroquois Steel & Iron Co.* (1929), 333 Ill. 588, 165 N.E.199.) In the present case, Congregation filed a "Statement of Non-Consent to Remittitur" professing its outright refusal to accept the trial court's

remittitur of the jury's verdict in the amount of $1,500,000 on the breach of contract count to $0. Congregation contends that although it cannot recover twice for the same injury, the verdict on the contract count can be raised to the same amount as the award on the negligence count. Touche Ross, however, maintains that the obvious inconsistency between the measure of damages awarded under two separate claims for relief mandates a new trial.

■■ As previously discussed, the law on the issue is well settled. Congregation's own expert, Mr. Vincent Sparrow, calculated its damages. Although the jury's verdict on the negligence count was $3,900,000, the trial court properly reduced that verdict to $3,819,352 to conform to the evidence presented at trial and primarily based upon Mr. Sparrow's testimony. The problem, however, arises with respect to the verdict of $1,500,000 on the breach of contract count. While the jury may have intended liability against Touche Ross on both counts, Congregation obviously cannot recover twice for the same injury. Accordingly, we will affirm the judgment of the trial court with regard to the remittitur of the negligence count from $3,900,000 to $3,819,352 and with regard to the reduction of the breach of contract verdict from $1,500,000 to $0 on the condition that plaintiff files a consent to the remittitur with the clerk of this court pursuant to Supreme Court Rule 366(a)(5) (107 Ill. 2d R. 366(a)(5)). In the event such consent is not filed within the 30-day period, the judgment is reversed, and the case is remanded to the trial court on the issue of damages.

We have reviewed each of the other purported trial errors presented by Touche Ross and find them to be meritless as to warrant no further discussion or consideration by the court.

CONGREGATION'S CROSS-APPEAL

PREJUDGMENT INTEREST

■■ On its cross-appeal, Congregation raises three issues. First, it contends that it is entitled to prejudgment interest as a matter of law. (Ill. Rev. Stat. 1989, ch. 17, par. 6702.) Additionally, courts allow awards of prejudgment interest to fully compensate an injured party for all damages incurred from the time the injury is sustained to the date upon which judgment is entered. *West Virginia v. United States* (1987), 479 U.S. 305, 309 n.2, 93 L. Ed. 2d 639, 646 n.2, 107 S. Ct. 702, 706 n.2; *In re Estate of Wernick* (1989), 127 Ill. 2d 61, 75, 535 N.E.2d 876, 888.

Touche Ross responds that the circuit court correctly concluded that Congregation was not entitled to prejudgment interest on the amounts awarded by the jury. This court has recently reaffirmed that "there is no right to recover prejudgment interest unless it is permitted by statute or there is an agreement between the parties." (*Alguire v. Walker* (1987), 154 Ill. App. 3d 438, 447, 506 N.E.2d 1334, 1341.) The record does not reflect the existence of an agreement between the parties governing prejudgment interest, and it is well settled that under Illinois statutes, there is no authorization for prejudgment interest in tort cases. (*Northern Trust Co. v. County of Cook* (1985), 135 Ill. App. 3d 329, 336, 481 N.E.2d 957, 962.) Moreover, even if the statute did apply here to the breach of contract claim, the judgment appealed from reflects no monetary award to which interest may be attached. Accordingly, we affirm the trial court on this issue.

### BREACH OF FIDUCIARY CLAIM

Congregation next asserts that the circuit court erred because abundant evidence exists in the record to support the breach of fiduciary claim. Touche Ross asserts that no Illinois court has held that a fiduciary relationship exists between an accountant and his client as a matter of law and here Congregation failed to present any evidence that Touche Ross ever exercised any influence, or domination and control over its investment decisions. (*In re Estate of Shedrick* (1984), 122 Ill. App. 3d 861, 866, 462 N.E.2d 581, 585.) It contends that the evidence shows Congregation monitored Newell and looked to its own financial advisors, not Touche Ross, for investment advice.

■■ The standard of review when considering the propriety of a circuit court's decision to direct a verdict is whether the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors defendant that no contrary verdict based on the evidence could ever stand. (*Rockett v. Chevrolet Motor Division, General Motors Corp.* (1975), 31 Ill. App. 3d 217, 220, 334 N.E.2d 764, 768.) Here, although the parties agreed to specific conditions involving review of the Newell securities and investments, the overall accounting and review process relationship between the parties did not involve an auditing arrangement whereas those cases that found a fiduciary relationship between an accountant and client involved strictly auditing situations. Thus, we affirm.

INCREASE OF MONETARY JUDGMENT ON BREACH OF CONTRACT VERDICT

Congregation argues that the circuit court was implored to increase the breach of contract damages by entry of judgment notwithstanding the verdict or, in the alternative, by modifying it to conform to the intent of the jury and comport with the evidence. It urges that no jury intent can be found in the present record to in any way limit the damages awarded for breach of contract to a sum below the amount of the malpractice award. Congregation thus asks this court to modify the verdict on the breach of contract count to provide damages of $3,819,352 in accordance with its authority to so amend pursuant to Supreme Court Rule 366(a)(1).

Touche Ross counters that judgment notwithstanding the verdict to increase the damages awarded on Congregation's breach of contract count would be inappropriate. Essentially, Congregation is requesting an order of *additur*, which Touche Ross must consent to in lieu of receiving a new trial. (*J.I. Case Co. v. McCartin-McAuliff Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 456, 516 N.E.2d 260, 265.) Touche Ross concludes that as it represented to the circuit court that it would not provide such consent, absent affirmance of the circuit court's order of remittitur on the breach of contract claim to $0, this court should order a new trial.

As discussed above, we are not satisfied with the trial court's decision with respect to the remittitur issue. Furthermore, we are less satisfied with Congregation's contention that *additur* is an appropriate solution to this problem. Accordingly, as above stated, we will follow the mandate of Supreme Court Rule 366(a)(5), and absent the consent of entry of remittitur by Congregation, this cause is then remanded to the trial court on the issue of damages.

Affirmed in part and remanded with instructions.

CAMPBELL and BUCKLEY, JJ., concur.